Nebraska Supreme Court Online Library
www.nebraska.gov/apps-courts-epub/
10/20/2017 09:13 AM CDT

STATE OF NEBRASKA, APPELLEE, V.
PAUL J. JEDLICKA, APPELLANT.
___ N.W.2d ___

Filed July 28, 2017.    No. S-16-629.

1. **Rules of Evidence: Hearsay: Appeal and Error.** Apart from rulings under the residual hearsay exception, an appellate court will review for clear error the factual findings underpinning a trial court's hearsay ruling and review de novo the court's ultimate determination whether the court admitted evidence over a hearsay objection or excluded evidence on hearsay grounds.

2. **Rules of Evidence: Hearsay.** Whether a statement was both taken and given in contemplation of medical diagnosis or treatment is a factual finding made by the trial court in determining the admissibility of the evidence under Neb. Evid. R. 803(3), Neb. Rev. Stat. § 27-803(3) (Reissue 2016).

3. **Effectiveness of Counsel: Postconviction: Records: Appeal and Error.** An ineffective assistance of counsel claim is raised on direct appeal when allegations of deficient performance are made with enough particularity for (1) an appellate court to make a determination of whether the claim can be decided upon the trial record and (2) a district court later reviewing a petition for postconviction relief to be able to recognize whether the claim was brought before the appellate court.

4. **Effectiveness of Counsel: Appeal and Error.** Whether a claim of ineffective assistance of trial counsel may be determined on direct appeal is a question of law.

5. ____: ____. In reviewing claims of ineffective assistance of counsel on direct appeal, an appellate court decides only questions of law: Are the undisputed facts contained within the record sufficient to conclusively determine whether counsel did or did not provide effective assistance and whether the defendant was or was not prejudiced by counsel's alleged deficient performance?

6.  **Appeal and Error.** An appellate court does not consider errors which are argued but not assigned.
7.  **Rules of Evidence: Hearsay.** A declarant's out-of-court statement offered for the truth of the matter asserted is inadmissible unless it falls within a definitional exclusion or statutory exception.
8.  \_\_\_\_: \_\_\_\_. Neb. Evid. R. 803(3), Neb. Rev. Stat. § 27-803(3) (Reissue 2016), is based on the notion that a person seeking medical attention will give a truthful account of the history and current status of his or her condition in order to ensure proper treatment.
9.  **Rules of Evidence: Hearsay: Sexual Assault: Minors.** Statements made by a child victim of sexual abuse to a forensic interviewer in the chain of medical care may be admissible under Neb. Evid. R. 803(3), Neb. Rev. Stat. § 27-803(3) (Reissue 2016), even though the interview has the partial purpose of assisting law enforcement's investigation of the crimes.
10.  **Rules of Evidence: Hearsay: Police Officers and Sheriffs.** The fundamental inquiry to determine whether statements, made by a declarant who knew law enforcement was listening, had a medical purpose is if the challenged statement has some value in diagnosis or treatment, because the patient would still have the requisite motive for providing the type of sincere and reliable information that is important to that diagnosis and treatment.
11.  **Rules of Evidence: Hearsay: Proof.** Statements having a dual medical and investigatory purpose are admissible under Neb. Evid. R. 803(3), Neb. Rev. Stat. § 27-803(3) (Reissue 2016), only if the proponent of the statements demonstrates that (1) the declarant's purpose in making the statements was to assist in the provision of medical diagnosis or treatment and (2) the statements were of a nature reasonably pertinent to medical diagnosis or treatment by a medical professional.
12.  **Rules of Evidence: Hearsay.** Under Neb. Evid. R. 803(3), Neb. Rev. Stat. § 27-803(3) (Reissue 2016), the admissibility of a victim's statements in a recording is not distinct from the admissibility of the statements themselves.
13.  **Rules of Evidence: Hearsay: Intent.** Under Neb. Evid. R. 803(3), Neb. Rev. Stat. § 27-803(3) (Reissue 2016), the fundamental inquiry when considering a declarant's intent is whether the statement was made in legitimate and reasonable contemplation of medical diagnosis or treatment.
14.  \_\_\_\_: \_\_\_\_: \_\_\_\_. Under Neb. Evid. R. 803(3), Neb. Rev. Stat. § 27-803(3) (Reissue 2016), the appropriate state of mind of the declarant may be reasonably inferred from the circumstances; such a determination is necessarily fact specific.

15. **Effectiveness of Counsel: Appeal and Error.** When a defendant's trial counsel is different from his or her counsel on direct appeal, the defendant must raise on direct appeal any issue of trial counsel's ineffective performance which is known to the defendant or is apparent from the record. Otherwise, the issue will be procedurally barred.

16. **Effectiveness of Counsel: Records: Appeal and Error.** The fact that an ineffective assistance of counsel claim is raised on direct appeal does not necessarily mean that it can be resolved on direct appeal. The determining factor is whether the record is sufficient to adequately review the question.

17. **Effectiveness of Counsel: Proof.** To prevail on a claim of ineffective assistance of counsel under *Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984), the defendant must show that his or her counsel's performance was deficient and that this deficient performance actually prejudiced the defendant's defense.

18. ____: ____. To show prejudice on a claim of ineffective assistance of counsel, the defendant must demonstrate a reasonable probability that but for counsel's deficient performance, the result of the proceeding would have been different.

19. **Effectiveness of Counsel: Proof: Presumptions.** The two prongs of the ineffective assistance of counsel test under *Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984), may be addressed in either order, and the entire ineffectiveness analysis should be viewed with a strong presumption that counsel's actions were reasonable.

20. ____: ____: ____. *United States v. Cronic*, 466 U.S. 648, 104 S. Ct. 2039, 80 L. Ed. 2d 657 (1984), provides narrow exceptions to the ineffective assistance of counsel test under *Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984), where the reliability of the adversarial process is in such doubt that prejudice to the defendant will be presumed, resulting in a conclusion of ineffective assistance of counsel.

21. **Effectiveness of Counsel: Presumptions.** Under *United States v. Cronic*, 466 U.S. 648, 104 S. Ct. 2039, 80 L. Ed. 2d 657 (1984), there are three circumstances where prejudice to the defendant will be presumed: (1) where the accused is completely denied counsel at a critical stage of the proceedings, (2) where counsel entirely fails to subject the prosecution's case to meaningful adversarial testing, and (3) where the surrounding circumstances may justify the presumption of ineffectiveness without inquiry into counsel's actual performance at trial.

22. **Effectiveness of Counsel.** The difference between the rule in *Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984), and the rule in *United States v. Cronic*, 466 U.S. 648, 104 S. Ct. 2039,

80 L. Ed. 2d 657 (1984), is the difference between bad lawyering and no lawyering.

23. ____. Under *United States v. Cronic*, 466 U.S. 648, 104 S. Ct. 2039, 80 L. Ed. 2d 657 (1984), for counsel to entirely fail to subject the prosecution's case to meaningful adversarial testing, the attorney's failure must be complete.

24. **Appeal and Error.** An appellate court is not obligated to engage in an analysis that is not necessary to adjudicate the case and controversy before it.

25. **Convictions: Evidence: Appeal and Error.** Regardless of whether the evidence is direct, circumstantial, or a combination thereof, and regardless of whether the issue is labeled as a failure to direct a verdict, insufficiency of the evidence, or failure to prove a prima facie case, the standard is the same: In reviewing a criminal conviction, an appellate court does not resolve conflicts in the evidence, pass on the credibility of witnesses, or reweigh the evidence; such matters are for the finder of fact, and a conviction will be affirmed, in the absence of prejudicial error, if the evidence admitted at trial, viewed and construed most favorably to the State, is sufficient to support the conviction.

Appeal from the District Court for Sarpy County: David K. Arterburn, Judge. Affirmed.

Ann C. Addison-Wageman, of Law Office of Ann C. Addison-Wageman, P.C., L.L.O., for appellant.

Douglas J. Peterson, Attorney General, and Kimberly A. Klein for appellee.

Heavican, C.J., Wright, Miller-Lerman, Cassel, Stacy, Kelch, and Funke, JJ.

Funke, J.

## I. NATURE OF CASE

In this direct appeal, Paul J. Jedlicka challenges his conviction, by jury verdict, for first degree sexual assault of a child under 12 years of age. Jedlicka primarily argues that he was prejudiced by the erroneous admission of hearsay evidence under the medical diagnosis and treatment exception, Neb. Evid. R. 803(3), Neb. Rev. Stat. § 27-803(3) (Reissue 2016).

We conclude that the court properly admitted such evidence under rule 803(3). We also reject Jedlicka's assertions that his trial counsel provided ineffective assistance and that the evidence was insufficient to support his conviction. Therefore, we affirm.

## II. FACTS

In May 2015, Jedlicka was in a relationship with the mother of the 10-year-old victim, M.B., and had been living with M.B., her mother, and her younger brother since the fall of 2014. On May 13, 2015, the mother was working the night shift as an emergency room nurse while Jedlicka watched M.B. and her brother. After playing a "scary" video game, M.B.'s brother wanted to sleep with her, but Jedlicka suggested both children sleep with him in his and their mother's bedroom. M.B. slept between Jedlicka and her brother.

M.B. testified that she woke up during the night to Jedlicka's fingers inside her vagina. She said that she was scared and confused but pretended to be asleep because she did not know what else to do; M.B. did not want Jedlicka to know that she knew what was happening so that she could tell someone later. She testified that she knew it was Jedlicka, because his hand was bigger than her brother's and she saw that her brother was asleep on his back when she briefly opened her eyes. M.B. said that eventually Jedlicka stopped and left the room.

The next morning, M.B. got ready for school and went to the bus stop with her brother. She said that she did not say anything that morning, because Jedlicka was the only adult at the house and she still did not want him to know she had been awake. M.B.'s mother met the children at the bus stop a minute or two before the bus arrived to make sure they got there on time. She said that her son was acting normal, but that M.B. was acting differently, clinging to her rather than playing with the other children. M.B. said that she did not tell her mother, because other people were around.

Once M.B. got to school, she told her teacher from the prior year about the incident. The teacher testified at trial that M.B. told her that Jedlicka had touched her privates. As a result, the teacher notified the school psychologist and made a report to Child Protective Services.

Det. Brandon Stigge reported to the school to investigate the allegation. He testified that M.B. was crying when he arrived and that he told her there were "way smarter" people than he was that would like to talk to her. Stigge called the mother and requested that she come to the school. While waiting for the mother to arrive, he contacted Project Harmony to request a forensic interview.

After the mother arrived at the school, Stigge told her M.B.'s allegation and explained to her the process that would take place. Stigge recommended that the mother take M.B. to Project Harmony. The mother testified that she took M.B. to Project Harmony voluntarily.

Project Harmony is a child advocacy center that serves children when there have been allegations of abuse. It provides forensic interview, medical, and mental health services and victim advocacy. Children typically become involved with Project Harmony by referral from law enforcement or Child Protective Services during an active investigation. Law enforcement and Child Protective Services representatives can watch the interviews by closed-circuit television and are provided a DVD of the video-recorded interviews.

April Anderson is a forensic interviewer at Project Harmony. She has a master's degree in social work and is a licensed mental health practitioner. Anderson has completed numerous training courses for forensic interviewing since she began working at Project Harmony in 2001, including training through the National Children's Advocacy Center (NCAC). She testified that she has conducted over 5,000 forensic interviews, close to 60 percent of which were in child sexual assault cases. Anderson stated that as a forensic interviewer, she conducts structured conversations with children to gather

information to piece together whether something did or did not happen.

Anderson testified that she provides the information she learns in her interviews to the nurse practitioner at Project Harmony, Sarah Cleaver, to assist Cleaver in making an appropriate medical diagnosis and in determining any appropriate medical care or mental health treatment the child may need. The information also assists in identifying the perpetrator to ensure the child is not being placed back in the home with the abuser.

Anderson testified that she met with M.B.'s mother before the interview to gather some background information and explain what was going to take place. Anderson then interviewed M.B. while Stigge and a caseworker observed the interview in an adjacent room by closed-circuit television.

The DVD of Anderson's interview with M.B. shows that Anderson began the interview by explaining that M.B. was safe and that nobody was going to hurt her. She also told M.B. that "two friends" were watching from another room to make sure Anderson did not forget to ask anything important. Then, Anderson explained the importance of telling the truth and M.B. agreed that she would tell the truth.

Anderson proceeded to ask M.B. open-ended questions about the abuse, under NCAC protocols. M.B.'s responses were initially vague, but she eventually described the sexual assault in detail. M.B. stated that she had slept with Jedlicka that night and woke up while it was still dark to Jedlicka's fingers inside her vagina.

After M.B. described the sexual assault, Anderson left the room to consult with Stigge. She testified that Stigge asked her to inquire further about the sleeping arrangement and how M.B. knew it was Jedlicka touching her, but she said that Stigge did not tell her any questions to ask.

Anderson stated that the information she learned from M.B. was important for her to determine the appropriate followup care and treatment for the child. Before examining M.B.,

Cleaver, who was not present to observe the interview, spoke with Anderson to gather information about M.B. Cleaver testified that it was important that she receive an accurate account of the assault, because "[i]t helps guide me during the exam as to where I should look, what kind of injuries I would potentially consider, [and] where I would potentially collect evidence from." She also stated that the information from Anderson assisted her in examining M.B., because she knew to obtain a DNA sample since the assault had occurred within 72 hours.

Cleaver began M.B.'s examination by asking her what had happened. Specifically, Cleaver inquired about (1) the time of the assault; (2) where M.B. was assaulted; (3) what M.B. may have done since the assault that would have interfered with DNA collection, including showering, urinating, and changing clothing; and (4) if M.B. had experienced pain during the assault.

Cleaver said the examination could neither confirm nor disprove a sexual assault occurred. She said that based on her training and experience, she would not expect to see any signs of injury based on M.B.'s report of digital penetration. Cleaver did not test for sexually transmitted diseases, because it was not a concern from digital penetration. After Cleaver's examination was complete, M.B. saw a therapist at Project Harmony.

At trial, Jedlicka objected to the admission of exhibit 2, the Project Harmony video recording of Anderson's interview of M.B., into evidence because it was hearsay. The court overruled Jedlicka's objection, finding that exhibit 2 qualified for the medical exception to hearsay. After the prosecution had concluded its case in chief, Jedlicka moved to dismiss by arguing that no reasonable juror could find that penetration occurred. The court overruled the motion.

The jury found Jedlicka guilty of first degree sexual assault of a child under 12 years of age. For the sentencing hearing, Jedlicka obtained substitute counsel from his trial. Jedlicka

was sentenced to a term of incarceration of 15 to 25 years. Jedlicka, with substitute counsel, appeals the conviction.

## III. ASSIGNMENTS OF ERROR

Jedlicka assigns, restated, the following errors: (1) The court erred by admitting hearsay evidence under the medical diagnosis and treatment exception, rule 803(3); (2) his trial counsel was ineffective; and (3) the court erred by overruling his motion to dismiss at the close of the State's case, because there was insufficient evidence to support his conviction.

## IV. STANDARD OF REVIEW

[1] Apart from rulings under the residual hearsay exception, we will review for clear error the factual findings underpinning a trial court's hearsay ruling and review de novo the court's ultimate determination whether the court admitted evidence over a hearsay objection or excluded evidence on hearsay grounds.[1]

[2] Whether a statement was both taken and given in contemplation of medical diagnosis or treatment is a factual finding made by the trial court in determining the admissibility of the evidence under rule 803(3).[2]

[3] An ineffective assistance of counsel claim is raised on direct appeal when allegations of deficient performance are made with enough particularity for (1) an appellate court to make a determination of whether the claim can be decided upon the trial record and (2) a district court later reviewing a petition for postconviction relief to be able to recognize whether the claim was brought before the appellate court.[3]

[4] Whether a claim of ineffective assistance of trial counsel may be determined on direct appeal is a question of law.[4]

---

[1] *State v. McCurry*, 296 Neb. 40, 891 N.W.2d 663 (2017).

[2] *State v. Vigil*, 283 Neb. 129, 810 N.W.2d 687 (2012).

[3] *State v. Ash*, 293 Neb. 583, 878 N.W.2d 569 (2016).

[4] *State v. Betancourt-Garcia*, 295 Neb. 170, 887 N.W.2d 296 (2016).

[5] In reviewing claims of ineffective assistance of counsel on direct appeal, an appellate court decides only questions of law: Are the undisputed facts contained within the record sufficient to conclusively determine whether counsel did or did not provide effective assistance and whether the defendant was or was not prejudiced by counsel's alleged deficient performance?[5]

## V. ANALYSIS

### 1. Excessive Sentence Not Assigned as Error

[6] We first dispose of a preliminary issue. An appellate court does not consider errors which are argued but not assigned.[6] Jedlicka argues that his sentence is excessive. However, he did not assign this proposition as error. As a result, we need not consider whether Jedlicka's sentence was excessive and we restrict our analysis to Jedlicka's listed assignments of error.

### 2. Exhibit 2 Was Not Inadmissible Hearsay Under Rule 803(3)

Jedlicka argues that exhibit 2 was hearsay not within the rule 803(3) exception, because it was not made in the chain of medical care and the State failed to demonstrate that M.B. made the statements therein with the intent to obtain medical diagnosis or treatment. He also contends that exhibit 2 was made only for investigatory purposes.

[7] Hearsay is a statement, other than one made by the declarant while testifying at the trial or hearing, offered to prove the truth of the matter asserted.[7] A declarant's out-of-court statement offered for the truth of the matter asserted is

---

[5] *Ash, supra* note 3.

[6] *State v. McCumber*, 295 Neb. 941, 893 N.W.2d 411 (2017).

[7] Neb. Evid. R. 801(3), Neb. Rev. Stat. § 27-801(3) (Reissue 2016).

inadmissible unless it falls within a definitional exclusion or statutory exception.[8]

[8] Rule 803(3) provides that the hearsay rule does not exclude "[s]tatements made for purposes of medical diagnosis or treatment and describing medical history, or past or present symptoms, pain, or sensations, or the inception or general character of the cause or external source thereof insofar as reasonably pertinent to diagnosis or treatment." Rule 803(3) is based on the notion that a person seeking medical attention will give a truthful account of the history and current status of his or her condition in order to ensure proper treatment.[9] In order for statements to be admissible under rule 803(3), the party seeking to introduce the evidence must demonstrate (1) that the circumstances under which the statements were made were such that the declarant's purpose in making the statements was to assist in the provision of medical diagnosis or treatment and (2) that the statements were of a nature reasonably pertinent to medical diagnosis or treatment by a medical professional.[10]

[9-11] In *State v. Vigil*,[11] we held that "statements made by a child victim of sexual abuse to a forensic interviewer in [the chain of medical care] may be admissible under rule 803(3) even though the interview has the partial purpose of assisting law enforcement's investigation of the crimes." We stated that the fundamental inquiry to determine whether statements, made by a declarant who knew law enforcement was listening, had a medical purpose is "'[i]f the challenged statement has some value in diagnosis or treatment, [because] the patient would still have the requisite motive for providing the type of "sincere and reliable" information that is important

---

[8] See, Neb. Evid. R. 802, Neb. Rev. Stat. § 27-802 (Reissue 2016); *State v. McCave*, 282 Neb. 500, 805 N.W.2d 290 (2011).

[9] *State v. Herrera*, 289 Neb. 575, 856 N.W.2d 310 (2014).

[10] *Id.*

[11] *Vigil, supra* note 2, 283 Neb. at 139, 810 N.W.2d at 696.

to that diagnosis and treatment.'"[12] Nevertheless, the admissibility of dual purpose statements are still subject to the general two-prong standard used to determine admissibility under rule 803(3).[13]

Jedlicka did not assert that M.B.'s statements were not reasonably pertinent or lacked value for medical diagnosis or treatment. Therefore, we consider only whether Anderson's interview was in the chain of medical care and whether M.B. made the statements therein with the intent to obtain medical diagnosis or treatment.

### (a) Anderson's Interview Was Conducted in Chain of Medical Care

Jedlicka asserts that exhibit 2 was not in the chain of medical care, primarily, because Cleaver did not watch it before examining M.B. Further, he contends that M.B.'s statements to Anderson were not in the chain of medical care, because Cleaver asked M.B. some of the same questions later. Specifically, Jedlicka argues that M.B.'s statements to Anderson could be in the chain of medical care only if they prevented her from being revictimized by having to recount the assault again later.

Although the heart of the rule 803(3) exception lies in statements made by a patient to a treating physician, the exception casts its net wider than the patient-physician relationship.[14] Accordingly, the admissibility of statements, under rule 803(3), is not dependent on whether they were made to a physician.[15] As mentioned above, we held in *Vigil* that statements made to a forensic interviewer may qualify for the rule 803(3) exception, if they are a part of the "'chain of medical care.'"[16]

---

[12] *Id*. at 137, 810 N.W.2d at 695-96.

[13] See *id.*

[14] *Id.*

[15] *Herrera*, *supra* note 9.

[16] *Vigil*, *supra* note 2, 283 Neb. at 137, 810 N.W.2d at 695.

In *Vigil*, Kelli Lowe, a forensic interviewer, recorded her interview with the victim, D.S. Lowe testified that her role was "'to gather the information for all, for everyone involved so that the child only has to go through it one time,'"[17] and "to determine possible abuse or traumatic injury."[18] She testified further that "the treating physician utilizes the forensic interview in determining the proper treatment and therapy for the patient."[19] Lowe stated that she verbally summarized the interview to a doctor, who then created the discharge instructions—recommending therapy and a physical examination—based solely on Lowe's summary. D.S. was not examined by a doctor until 9 days later.

At the defendant's trial, the video-recorded interview between D.S. and Lowe was entered into evidence. We did not consider the fact that the video recording was never viewed by the treating physician to be relevant in determining its admissibility. We held that the video recording was properly admitted as evidence under rule 803(3).

[12] Accordingly, under rule 803(3), the admissibility of a victim's statements in a recording is not distinct from the admissibility of the statements themselves. Therefore, we consider only whether M.B.'s statements to Anderson are admissible.

The facts concerning M.B.'s statements to Anderson are substantially the same as D.S.' statements to Lowe in *Vigil*. Anderson testified that her forensic interviews derive information that is used to guide the treatment of a victim regarding medical care, therapeutic care, and followup treatment. Cleaver testified that she did not watch the video-recorded interview, but merely received a verbal summary of it from Anderson. Similar to *Vigil*, Cleaver's determination that M.B. should receive a medical examination was based solely on Anderson's

---

[17] *Id.* at 133-34, 810 N.W.2d at 693.

[18] *Id*. at 133, 810 N.W.2d at 693.

[19] *Id.*

summary. Further, Cleaver testified that Anderson's summary informed her that the need for an examination was imminent because the 72-hour window to collect DNA evidence from M.B. had not passed.

Jedlicka's argument that statements to a forensic interviewer are not in the chain of medical care if they do not prevent any requestioning of a victim that might lead to revictimization is without merit. Such an argument is not based on any holdings by this court, but, instead, on a statement made by Lowe, included in our opinion in *Vigil*, describing her role as a forensic interviewer.

In *Vigil*, we did not consider whether the doctor who later examined D.S. asked her questions that were also asked by Lowe. Further, we do not think it desirable to discourage medical professionals from discussing a child victim's assault with the child, to build rapport and to understand the child's emotional state, before engaging in the type of intimate examination required in these situations.

Here, Anderson interviewed M.B. the day that she was assaulted and was the first person to whom M.B. told specific details. Anderson emphasized the need for M.B. to tell the truth, and her NCAC training assisted M.B. to share progressively more details of the assault throughout the interview. Cleaver's testimony that it was important that she receive an accurate account of the assault to guide her examination and inform her of potential injuries emphasizes the importance of Anderson's extensive training in interviewing child sexual assault victims.

Further, Anderson's interview focused on broader issues—including the perpetrator's identity and the circumstances of the assault—than Cleaver's recount of her interview, which focused more on symptoms and evidence collection. In *Vigil*, we explained that "[t]he frequency and nature of the sexual contacts with [the defendant] were part of D.S.' medical history" and that the defendant's familial relationship with D.S. and his residence in the home with her made his identity

reasonably pertinent to diagnosis and treatment.[20] Additionally, we stated that "[d]etails of the abuse are relevant to psychological implications regardless of whether any physical injury occurred. . . . [E]valuation of the need for psychological treatment is a fundamental component of sexual assault cases and, thus, a component of medical diagnosis and treatment in such cases."[21]

Accordingly, Anderson's interview elicited facts that were reasonably pertinent to Cleaver's diagnosis and treatment of M.B., including the recommendation that M.B. follow up with a mental health therapist at the conclusion of her examination. Therefore, the court did not err in findings that Anderson was acting in the chain of medical care.

(b) M.B.'s Statements to Anderson Were
Made With Intent to Obtain Medical
Diagnosis or Treatment

Jedlicka also argues that the State failed to present sufficient direct or circumstantial evidence that M.B.'s statements during the interview were made for the purpose of medical diagnosis or treatment. Specifically, he asserts that neither M.B. nor her mother testified that she had medical concerns about M.B., that she knew what Project Harmony was, or that she knew that M.B. would receive medical treatment after the interview. Additionally, Jedlicka argues that the setting of the interview was not medical in nature.

[13,14] Under rule 803(3), the fundamental inquiry when considering a declarant's intent "is whether the statement, despite its dual purpose, was made in legitimate and reasonable contemplation of medical diagnosis or treatment."[22] Under rule 803(3), there need not be direct evidence of the

---

[20] *Id.* at 141, 810 N.W.2d at 698.

[21] *Id.* at 140-41, 810 N.W.2d at 697-98.

[22] *Herrera, supra* note 9, 289 Neb. at 598, 856 N.W.2d at 330, citing *Vigil, supra* note 2.

declarant's state of mind; instead, the appropriate state of mind of the declarant may be reasonably inferred from the circumstances.[23] Determining if the circumstances warrant inferring the appropriate state of mind is necessarily a fact-specific determination.[24]

In *Vigil*, we determined that D.S.' statements to Lowe were pertinent to medical diagnosis or treatment.[25] There, we considered the following facts: D.S.' mother was concerned for D.S.' physical and psychological health; D.S. believed she would be physically examined after the interview, and her mother had explained to her that certain medical procedures may be necessary; D.S. was concerned that she had gotten sick from the abuse; and D.S. was checked into the hospital, where the forensic interview took place, as a patient.

We also cited another case in *Vigil* where a court had inferred that the victim's statements in a video-recorded interview were for medical diagnosis or treatment, *State v. Donald M.*[26] There, the court relied on the following facts: The 10-year-old victim was taken to a child advocacy center in a hospital, the interviewer testified that the purpose of the interview was to assess the physical and psychological needs of the victim, and a social worker testified that she had told the victim that the interviewer was going to make sure she was safe and determine if a doctor examination would be necessary.

Here, there is no direct testimony from M.B. that she made her statements to Anderson with the intent to receive medical diagnosis or treatment. However, there is circumstantial evidence from which the court could infer that M.B. made her statements with such intent.

---

[23] *Vigil, supra* note 2, citing *State v. Vaught*, 268 Neb. 316, 682 N.W.2d 284 (2004).

[24] See *id.*

[25] *Id.*

[26] *State v. Donald M.*, 113 Conn. App. 63, 966 A.2d 266 (2009).

First, as in *Donald M.*, M.B. testified that Anderson told her that she was there to help and make sure that nothing was wrong with her. Additionally, the video recording shows Anderson telling M.B. that she is safe and that nobody is going to hurt her and asking M.B. if she will tell the truth and talk only about things that are real and true.

Second, as in *Donald M.*, Anderson testified that one purpose of her interviews is to help figure out what needs the child may have regarding medical or therapeutic care to make a determination concerning any followup treatment or care that may be needed for the child.

Third, as in *Vigil*, M.B.'s mother had an understanding of the process that would take place at Project Harmony and consented to Anderson's interview to get M.B. help. Stigge testified that he explained to M.B.'s mother the process that would occur at Project Harmony. Specifically, he requested that she take M.B. there for M.B.'s safety and told her that Project Harmony had therapists that M.B. could speak with. In *Vigil*, we also stated that "psychological treatment is a fundamental component of sexual assault cases and, thus, a component of medical diagnosis and treatment in such cases."[27] It is also relevant that M.B.'s mother was an emergency room nurse and would have a much greater understanding of the followup required for a victim of sexual assault.

Jedlicka's assertion that the absence of certain factors precludes an inference that M.B.'s statements were made for the purpose of medical diagnosis or treatment is without merit. As mentioned above, the circumstances in every case will be different, and no one fact is dispositive in our analysis.

Therefore, based on the circumstances, the court did not err by inferring that M.B. made her statements with the intent to receive medical diagnosis or treatment.

---

[27] *Vigil, supra* note 2, 283 Neb. at 141, 810 N.W.2d at 697-98.

### 3. Jedlicka's Trial Counsel Did Not Provide Ineffective Assistance

Jedlicka contends that his trial counsel was ineffective for (l) failing to object to the admission of exhibit 2; (2) failing to develop and marshal a proper and reasonable defense strategy by failing to utilize a rebuttal forensic expert, a DNA expert, and a supporting medical expert; and, as a result, (3) failing to subject the State's case to meaningful adversarial testing.

[15] Jedlicka is represented on direct appeal by different counsel than at trial. When a defendant's trial counsel is different from his or her counsel on direct appeal, the defendant must raise on direct appeal any issue of trial counsel's ineffective performance which is known to the defendant or is apparent from the record. Otherwise, the issue will be procedurally barred.[28]

[16] An ineffective assistance of counsel claim is raised on direct appeal when the claim alleges deficient performance with enough particularity for (1) an appellate court to make a determination of whether the claim can be decided upon the trial record and (2) a district court later reviewing a petition for postconviction relief to recognize whether the claim was brought before the appellate court.[29] However, the fact that an ineffective assistance of counsel claim is raised on direct appeal does not necessarily mean that it can be resolved on direct appeal.[30] The determining factor is whether the record is sufficient to adequately review the question.[31] An ineffective assistance of counsel claim will not be resolved on direct appeal if it requires an evidentiary hearing.[32]

---

[28] *State v. Parnell*, 294 Neb. 551, 883 N.W.2d 652 (2016).

[29] *Ash, supra* note 3.

[30] *Id.*

[31] *Id.*

[32] *Id.*

## (a) Two Tests for Claims of Ineffective
## Assistance of Counsel:
## *Cronic* and *Strickland*

[17-19] In order to assess the adequacy of counsel's assistance under the Sixth Amendment, we ordinarily apply the two-part test enunciated by the U.S. Supreme Court in *Strickland v. Washington*.[33] To prevail on a claim of ineffective assistance of counsel under the *Strickland* analysis, the defendant must show that his or her counsel's performance was deficient and that this deficient performance actually prejudiced the defendant's defense.[34] To show prejudice, the defendant must demonstrate a reasonable probability that but for counsel's deficient performance, the result of the proceeding would have been different.[35] The two prongs of this test may be addressed in either order, and the entire ineffectiveness analysis should be viewed with a strong presumption that counsel's actions were reasonable.[36]

[20,21] However, Jedlicka directs us to *United States v. Cronic*,[37] the companion case to *Strickland*. *Cronic* provides narrow exceptions to the *Strickland* analysis, where the reliability of the adversarial process is in such doubt that prejudice to the defendant will be presumed, resulting in a conclusion of ineffective assistance of counsel.[38] The three circumstances where prejudice will be presumed are "(1) where the accused is completely denied counsel at a critical stage of the proceedings, (2) where counsel [entirely] fails to subject the

---

[33] *Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984).

[34] *Betancourt-Garcia, supra* note 4.

[35] *Id.*

[36] *Ash, supra* note 3.

[37] *United States v. Cronic*, 466 U.S. 648, 104 S. Ct. 2039, 80 L. Ed. 2d 657 (1984).

[38] *State v. Trotter*, 259 Neb. 212, 609 N.W.2d 33 (2000), citing *Cronic, supra* note 37.

prosecution's case to meaningful adversarial testing, and (3) where the surrounding circumstances may justify the presumption of ineffectiveness without inquiry into counsel's actual performance at trial."[39] These circumstances "are so likely to prejudice the accused that the cost of litigating their effect in a particular case is unjustified."[40]

[22] The Fifth Circuit Court of Appeals described the difference between the *Strickland* and *Cronic* rules as the difference between bad lawyering and no lawyering.[41] It explained:

The difference between bad and no lawyering is critical . . . because very different results flow from the label which is attached to the conduct in question. If the lawyering is merely ineffective, then the decision to upset the conviction, which turns on the presence of incompetence and prejudice, is made on a case by case basis. *See Strickland*. If, on the other hand, the defendant was constructively denied the assistance of counsel, then the conviction must be overturned because prejudice is presumed. *See Cronic*.[42]

The U.S. Supreme Court emphasized the distinction between the *Strickland* and *Cronic* rules in *Bell v. Cone*.[43] It stated that "[f]or purposes of distinguishing between the rule of *Strickland* and that of *Cronic*, this difference is not of degree but of kind."[44]

In *Cone*, the defendant was being tried for first degree murder. Defense counsel raised mitigating circumstances and asked for mercy in his opening statement, successfully objected to the introduction of prejudicial evidence, and

---

[39] *State v. Davlin*, 265 Neb. 386, 401, 658 N.W.2d 1, 12-13 (2003), citing *Trotter, supra* note 38.

[40] *Cronic, supra* note 37, 466 U.S. at 658.

[41] *Woodard v. Collins*, 898 F.2d 1027 (5th Cir. 1990).

[42] *Id.* at 1028.

[43] *Bell v. Cone*, 535 U.S. 685, 122 S. Ct. 1843, 152 L. Ed. 2d 914 (2002).

[44] *Id.*, 535 U.S. at 697.

adduced mitigating facts regarding his client, but he waived his closing argument after a junior prosecutor gave a "'low-key'" closing argument, to prevent the lead prosecutor from having a rebuttal.[45] The Sixth Circuit Court of Appeals applied the second *Cronic* exception to presume prejudice against the defendant, because defense counsel's failure to ask for mercy "did not subject the State's call for the death penalty to meaningful adversarial testing."[46]

[23] The Supreme Court reversed, stating that the second *Cronic* exception did not apply. It emphasized that for the exception to apply, the "attorney's failure must be complete" and emphasized that counsel must "'*entirely* fail[] to subject the prosecution's case to meaningful adversarial testing.'"[47] The following statements by the Court emphasize the difference between *Strickland* and *Cronic* claims:

> Here, respondent's argument is not that his counsel failed to oppose the prosecution throughout the sentencing proceeding as a whole, but that his counsel failed to do so at specific points. . . .
>
> The aspects of counsel's performance challenged by respondent—the failure to adduce mitigating evidence and the waiver of closing argument—are plainly of the same ilk as other specific attorney errors we have held subject to *Strickland*'s performance and prejudice components.[48]

In accordance with this view, courts rarely apply the *Cronic* exceptions.[49] The Supreme Court confirmed this as the correct approach in *Florida v. Nixon*[50] when it again emphasized

---

[45] *Id.*, 535 U.S. at 692.

[46] *Id.*, 535 U.S. at 693.

[47] *Id.*, 535 U.S. at 697 (emphasis in original).

[48] *Id.*, 535 U.S. at 697-98.

[49] See, e.g., *Malcom v. Houston*, 518 F.3d 624 (8th Cir. 2008).

[50] *Florida v. Nixon*, 543 U.S. 175, 189, 125 S. Ct. 551, 160 L. Ed. 2d 565 (2004).

that counsel must "entirely fail[] to function as the client's advocate." Further, the Court stated: "We illustrated just how infrequently the 'surrounding circumstances [will] justify a presumption of ineffectiveness' in *Cronic* itself. In that case, we reversed a Court of Appeals ruling that ranked as prejudicially inadequate the performance of an inexperienced, underprepared attorney in a complex mail fraud trial."[51] Other courts have similarly rejected claims of ineffective assistance of counsel that are directed at counsel's performance in acting as an advocate for their client.[52]

### (b) Jedlicka Did Not Receive Ineffective Assistance of Counsel Under *Cronic* Rule

Jedlicka argues that under *Cronic*, we should presume prejudice in this case. He alleges specific mistakes that his trial counsel made and argues that the aggregate effect of these mistakes constitutes a failure to subject the State's case in chief to meaningful adversarial testing. Additionally, he contends generally that his counsel's cross-examinations of the State's witnesses were wholly ineffective.

As discussed above, allegations of bad lawyering are not proper for consideration under the *Cronic* exceptions. Jedlicka has made no allegations of deficient performance showing his attorney's failure was complete, constituting a constructive denial of the assistance of counsel. As in *State v. Dubray*,[53] Jedlicka's counsel advocated on his behalf as an attorney at trial. Therefore, Jedlicka's reliance upon *Cronic* is misplaced and his allegations of specific mistakes are properly considered under *Strickland* instead.

---

[51] *Id.*, 543 U.S. at 190 (citation omitted).

[52] See, e.g., *Malcom, supra* note 49; *Scarpa v. Dubois*, 38 F.3d 1 (1st Cir. 1994).

[53] *State v. Dubray*, 294 Neb. 937, 885 N.W.2d 540 (2016).

## (c) Jedlicka's Claims of Ineffective
## Assistance of Counsel
## Under *Strickland* Rule

### (i) Failure to Object to Exhibit 1

Jedlicka argues that his trial counsel should have objected to exhibit 1, the picture drawn by M.B. depicting the sleeping arrangement when the assault occurred, because it was hearsay.

Jedlicka cannot establish prejudice by his counsel's failure to object. Both Jedlicka and M.B. testified that the sleeping situation was as depicted by the drawing. Therefore, Jedlicka cannot demonstrate a reasonable probability that the result of the proceeding would have been different if counsel had objected.

### (ii) Stigge's Testimony

Jedlicka contends that his trial counsel's decision to ask Stigge if there were any inconsistencies in Jedlicka's statements during his interrogation opened the door for the prosecution to point out the inconsistencies in his statements on redirect, destroying his credibility. He also specifically identifies one of Stigge's answers, which he argues would have otherwise been inadmissible, as especially damaging to his credibility: "[Prosecutor:] Well, do you feel he was being honest with you? [Stigge:] No, I did not."

Further, Jedlicka asserts that his attorney failed to object to several of the prosecution's leading questions concerning the inconsistencies in his statements and that when his attorney did successfully object to some of the prosecution's questions on the subject, he failed to have the questions stricken from the record.

The record before us is insufficient to determine whether trial counsel's decision to ask about inconsistencies in Jedlicka's statements during his interrogation and his decision to object to only some of the prosecution's leading questions on the

subject were part of his trial strategy. Therefore, we decline to address these questions on direct appeal.

However, the record is sufficient to address his attorney's failure to move to strike the questions he successfully objected to. Both successful objections made by Jedlicka's attorney were made before Stigge answered the prosecutor's objected-to questions. Jury instruction No. 1 read, in part, that "[y]ou must not speculate as to possible answers to questions I did not permit to be answered . . . ." Therefore, Jedlicka cannot show that he was prejudiced by his attorney's failure to have the questions stricken from the record.

### (iii) Failure to Impeach M.B.

Jedlicka asserts that M.B.'s prior testimony, concerning her sleeping position, was inconsistent with her testimony at trial. In addition to presenting an opportunity to impeach M.B., her prior testimony would have created reasonable doubt as to the feasibility of the assault. However, Jedlicka acknowledges that this allegation cannot be resolved on direct appeal, because M.B.'s deposition is not in evidence. We agree.

### (iv) Failure to Retain Expert Witnesses

Jedlicka asserts that his trial counsel should have called experts to rebut the following witnesses' testimony: a forensic DNA analyst who testified that testing M.B.'s underwear and vaginal swab for DNA would not have been useful in proving or disproving Jedlicka's guilt; Anderson, whose NCAC interview techniques elicited M.B.'s first allegation of penetration; and Cleaver, who discussed studies supporting her conclusion that digital sexual penetration rarely causes vaginal injuries.

The parties recognize that the record is currently insufficient, because there is no evidence that Jedlicka requested such experts or any evidence concerning his trial counsel's strategy. The State, however, argues that Jedlicka has not sufficiently preserved the record for a postconviction action,

because he did not make any allegations of what such experts would have actually testified to.

[24] We agree with the parties that the record is currently insufficient to review Jedlicka's claims. From our review of the record, we cannot make any meaningful determination whether expert testimony beneficial to Jedlicka could have been produced or, if it could have, whether trial counsel made a reasonable strategic decision not to present certain evidence.[54] The record is, therefore, insufficient to adequately review these claims on direct appeal, and we decline to consider them at this time.[55] As a result, we do not consider the State's contention that Jedlicka's specific allegations of deficient conduct are not sufficient to preserve the record for appeal. An appellate court is not obligated to engage in an analysis that is not necessary to adjudicate the case and controversy before it.[56]

### 4. THERE WAS SUFFICIENT EVIDENCE TO CONVICT JEDLICKA

Jedlicka argues that the court erred in overruling his motion to dismiss, because the prosecution presented insufficient evidence to warrant a conviction. He asserts that his statement of events has never changed, that M.B.'s story has changed—at Anderson's prompting, and that there is no physical evidence of the assault.

[25] Regardless of whether the evidence is direct, circumstantial, or a combination thereof, and regardless of whether the issue is labeled as a failure to direct a verdict, insufficiency of the evidence, or failure to prove a prima facie case, the standard is the same: In reviewing a criminal conviction, an appellate court does not resolve conflicts in the evidence, pass on

---

[54] See *State v. Nolan*, 283 Neb. 50, 807 N.W.2d 520 (2012).

[55] See *id.* See, also, *State v. Filholm*, 287 Neb. 763, 848 N.W.2d 571 (2014); *State v. Morgan*, 286 Neb. 556, 837 N.W.2d 543 (2013).

[56] *Estermann v. Bose*, 296 Neb. 228, 892 N.W.2d 857 (2017).

the credibility of witnesses, or reweigh the evidence; such matters are for the finder of fact, and a conviction will be affirmed, in the absence of prejudicial error, if the evidence admitted at trial, viewed and construed most favorably to the State, is sufficient to support the conviction.[57]

Accordingly, we will not review the credibility of Jedlicka or M.B. as witnesses, resolve the conflicts in his or her testimony, or reweigh the evidence of Jedlicka's guilt; these were determinations appropriate only for the trier of fact. We have found no prejudicial error regarding the evidence presented or Jedlicka's assistance of counsel. M.B. testified that Jedlicka assaulted her. Along with the other evidence admitted at trial, all viewed in favor of the State, there was sufficient evidence for a rational jury to find beyond a reasonable doubt that Jedlicka was guilty of first degree sexual assault of a child under 12 years of age. This assignment of error is without merit.

## VI. CONCLUSION

We conclude that exhibit 2 was properly admitted as evidence under the medical diagnosis and treatment hearsay exception. Further, Jedlicka's contentions of ineffective assistance of trial counsel either lack merit or cannot be resolved, because the record on direct appeal is insufficient. Finally, Jedlicka's argument that there was insufficient evidence to support the verdict is without merit. Accordingly, Jedlicka's conviction is affirmed.

AFFIRMED.

---

[57] *Betancourt-Garcia, supra* note 4.