IN THE NEBRASKA COURT OF APPEALS

**MEMORANDUM OPINION AND JUDGMENT ON APPEAL**
**(Memorandum Web Opinion)**

STATE V. LAN

NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).

STATE OF NEBRASKA, APPELLEE,

V.

SHAWN LAN, APPELLANT.

Filed November 24, 2020.    No. A-20-115.

Appeal from the District Court for Douglas County: GREGORY M. SCHATZ, Judge. Affirmed.

Joshua W. Weir, of Black & Weir Law Offices, L.L.C., for appellant.

Douglas J. Peterson, Attorney General, and Nathan A. Liss for appellee.

PIRTLE, Chief Judge, and MOORE and RIEDMANN, Judges.

RIEDMANN, Judge.

## INTRODUCTION

Shawn Lan appeals his convictions in the district court for Douglas County on one count of terroristic threats and one count of stalking while in possession of a deadly weapon, both Class IIIA felonies. On appeal, Lan asserts his convictions should be overturned because of the court's error in denying a motion to suppress the evidence found in the search of Lan's vehicle, the court's failure to provide a limiting instruction, and insufficiency of the evidence to convict him. Finding no error by the trial court, we affirm.

## BACKGROUND

On January 7, 2018, Sao Liu and his wife, Thuy Liu, attended a church service at the Omaha Chinese Christian Church. The couple drove separately, and Thuy arrived at the church before Sao. When Thuy exited her vehicle, an older man approached her and asked, "how are you?

- 1 -

how's your family?" in Chinese. Since Thuy was only able to speak minimal Chinese, she asked Lan, who was standing behind the older man, if Lan could help him. Lan responded that he could not help because he was ushering at the service, so Thuy walked inside.

Lan and the older man were still standing outside the church when Sao arrived. While entering the church, Sao was approached by the older man, who asked Sao three times, "how are you, how's your family?" Sao was "a little concerned" about the nature of the questioning but answered and entered the church nonetheless.

Once seated in the church, Sao and Thuy noticed the older man sitting two rows directly in front of them. Sao testified that throughout the service, the older man repeatedly "would turn around and stare at me and kind of give a smirk" for approximately 15 seconds each time. Once the service ended, Sao and Thuy exited the chapel, and the older man repeated the same questions he had asked Sao prior to the service. After attending a deacons' meeting in the church, Sao noticed Thuy trying to help the older man, who "looked a little lost." When Sao approached the pair, the older man resumed asking Sao the same questions he had asked earlier. Lan himself did not have any other interactions with Sao that day.

On the morning of January 8, 2018, Thuy drove into the parking garage located under the business at which she and Sao worked. On her way into the parking garage, she noticed Lan and the older man standing in front of the building. As the parking garage doors closed, she saw "a shadow" at the entrance to the parking garage. Later, while Thuy was in the basement of the building, she saw the pair in the basement hallway. Thuy testified she was "panicked" because "really now I really know that they specifically, you know, got at me and were interested in me" and that they "really start[ed] invading my privacy." She reported them to the business' accounting manager. When the accounting manager asked them why they were there, the pair left.

Later that day, when Thuy returned home for lunch, she saw Lan and the older man standing in front of the entrance to the Lius' neighborhood. She asked the two men to leave her alone and threatened to call the police. Rather than continuing to her home, she turned around because she "didn't want to stay around anymore." When asked at trial why she was scared, Thuy testified that "when you don't know me, you show up two times at the private places that I am at, I really think I have the right to be scared."

Sao testified that he was fearful as a result of these incidents, stating that there must have been something Lan "[has] against us," and "we don't know what this is all about. We don't know these individuals. We don't know why they would be doing what they're doing." Sao reported the incidents to the church; subsequently, the church hired security around January 13, 2018. An off-duty police officer or sheriff was in uniform and provided protection at the church on Friday evenings and during Sunday services, along with any other time the church requested their presence.

On March 16, 2018, Sao and Thuy received an email with the subject line "how are you" from Lan. The email stated in part, "God will punish you. There is an old Chinese saying, harming others is like harming yourself, those who harm others will get harmed themselves." Lan also warned, "Don't believe me? Keep trying." Sao testified that the email "made [him] feel very fearful" because he did "not understand why [Lan was] escalating this and why he's focused on [Sao's] family." Sao responded to the email and made a police report about the email from Lan.

Juliet Liu, Sao and Thuy's daughter, telephoned Sao on March 16, 2018, to tell him that Lan and his father had come to her home in Chicago. Lan told Juliet that Sao had been "persecuting my sister and I for the past five years and this needs to stop or else."

Sao and Thuy received subsequent emails from Lan on March 31, May 16, and June 10, 2018, each of them causing the Lius to feel "very frightened and concerned for [their] safety." These emails were sent in Chinese and were later translated to English by an FBI language analyst. The first March 31 email stated in relevant part:

God will definitely punish fake Christians like you. The brothers and sisters in the Omaha Chinese Church will see what kind of end will come to you.

God will punish you as a wolf in sheep's clothing. God will send evil people to hell.

You are vicious. Do you have some new tricks that are even more evil? This is the second warning to you. We shall see. I am waiting.

A second email on March 31 stated in relevant part, "If you don't stop, you will be the biggest losers. If you don't believe it, please continue. I will have brothers and sisters at the Omaha Chinese Church to witness it."

The May 16, 2018, email stated in relevant part:

This is the third warning.

If you have the guts to do something more vicious than what you did in Philadelphia, we are waiting in Chicago.

You guys wait for me in Omaha too.

I will have the brothers and sisters at the Omaha Chinese Church to witness this. I will expose all the shady things prohibited by Christian doctrine that you have done over the past five years.

If you guys have the guts to do it again. I will make newspaper headlines out of your household.

The Lius then filed a restraining order against Lan on May 24, 2018, although it was not served on Lan until June 17.

Lan sent his final email on June 10, 2018, to the members of the Omaha Chinese Church and included a list of grievances and claims Lan had against Sao and Thuy. Lan claimed that since 2013, Sao and Thuy had been "hiring people to persecute" Lan and his sister. He claimed that the Lius hired people to kill Lan and his sister, deflate and over-inflate Lan's car tires, harass the siblings "by making noise, such as to knock on the floor all day long and run the water in the bathtub at maximum flow every day," "loudly curse outside of our window saying something like you will not live beyond Thanksgiving and Christmas," and change his sister's grades in school. He ended the email by writing, "God will punish the LIUs and we can all witness what kind of ending they will have."

After receiving the June 10, 2018, email, Sao and Thuy began arming the alarm system and motion-sensor cameras in their home. Thuy testified that the couple used to hold prayer meeting groups in their home but stopped after receiving the June 10 email. Sao obtained a concealed weapon carry permit, which he testified he "had never entertained about doing, but this

kind of forced [him] to consider that." He also purchased a handgun in response to the emails and interactions with Lan. Sao also continued to contact the police about the emails. Sao and Thuy became more vigilant to protect themselves, including checking their surroundings.

On June 17, 2018, Deputy Sheriff Jarrod Wineinger of the Douglas County sheriff's department was working in his capacity as a part-time uniform security guard at the Omaha Chinese Christian Church. Wineinger was surveilling the area and noticed a vehicle parked in the church's parking lot in what Wineinger considered to be a "surveillance position." The vehicle "was parked backed into a stall facing the building contrary to how everyone else would park facing out towards the street." Wineinger "observed a lone male sitting in the vehicle" and "noticed when [Wineinger] got out of [his] truck [the male] broke eye contact with [Wineinger] immediately." Wineinger then approached the male, talked with him, and then began to walk inside the church to retrieve Lan's DMV photo in order to check if the male was Lan. A church member then verbally identified Lan to Wineinger, who checked the DMV photo, made a positive identification of Lan's identity, and called dispatch to run the vehicle's license plate. Wineinger then returned to the vehicle to talk with Lan. Dispatch confirmed Lan's ownership of the vehicle in the parking lot, and Wineinger called for backup cruisers.

Lan stepped out of his vehicle and moved away from it while he and Wineinger conversed. Three police units arrived at the scene. Wineinger noticed the interior of Lan's vehicle was messy, "like he had been kind of living out of the vehicle." Another officer on the scene observed the front passenger side of the vehicle and noticed "a spent shell casing for a handgun either on the seat or on the floorboard." Wineinger then asked Lan for permission to search the vehicle for narcotics or weapons, but Lan did not give permission to do so. Because Wineinger knew about prior alleged threats Lan made against the Lius, he contacted the Omaha Police Department detective assigned to the case and was given permission to arrest Lan on a charge of terroristic threats.

Lan's vehicle was going to be impounded, so an inventory was taken of its contents, including those found in the trunk. The search found an unloaded 9mm Glock handgun, a box of ammunition, two Glock 9mm magazines, and a speed loader in the hatchback of Lan's vehicle. The inventory search also discovered a digital camera, a concealed carry card dated May 30, 2018, and receipts indicating Lan traveled from Chicago to Omaha from June 16 until June 17. The digital camera's SD card contained photographs of Sao's place of employment, the entrance to the Lius' neighborhood, the parking lot of the Omaha Chinese Christian Church, and Sao's personal vehicle. Additionally, the search found an aerial map of the church and a receipt for the sale of two Glock handguns in Lan's name, including the particular Glock handgun found in Lan's vehicle at that time.

On August 16, 2018, Lan was charged with one count of terroristic threats. Lan filed a motion to dismiss, which the court denied. On June 24, the court granted the State leave to file an amended information; the State added one count of stalking while in possession of a deadly weapon. On August 8, Lan requested to proceed pro se, which the court granted with the condition of its appointment of standby counsel. Lan filed a motion to suppress the evidence found in his vehicle and a motion to dismiss count II of the amended information. The court denied both motions.

Lan filed a subsequent motion to dismiss both charges based on new evidence. The court denied both motions.

A jury trial was held on November 12 through 18, 2019. The jury found Lan guilty of one count of terroristic threats and one count of stalking while in possession of a deadly weapon. Lan was sentenced to 2 years' imprisonment on count I and 2 years' imprisonment on count II to run consecutively. Lan was credited 61 days of time served. The court also required 12 months' postrelease supervision as to each count to run consecutively. Lan timely appeals his convictions.

## ASSIGNMENTS OF ERROR

Restated, Lan assigns that (1) the district court erred in determining he was arrested after an arrest warrant had been issued and his vehicle was searched subsequent to a lawful arrest, (2) the district court erred in failing to provide the jury a limiting instruction on the proper use of Juliet's testimony regarding her out-of-state interactions with Lan, and (3) the evidence was insufficient to convict him.

## STANDARD OF REVIEW

In determining the correctness of a trial court's ruling on a motion to suppress, the appellate court will uphold the trial court's findings of fact unless they are clearly wrong, but will reach a conclusion independent of that reached by the trial court with regard to questions of law. *State v. Henry*, 292 Neb. 834, 875 N.W.2d 374 (2016).

An appellate court will not consider an issue on appeal that was not presented to or passed upon by the trial court. *State v. Thomas*, 303 Neb. 964, 932 N.W.2d 713 (2019).

In reviewing a criminal conviction for a sufficiency of the evidence claim, the relevant question for an appellate court is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *State v. McCurdy*, 301 Neb. 343, 918 N.W.2d 292 (2018). Regardless of whether the evidence is direct, circumstantial, or a combination thereof, the standard is the same: An appellate court does not resolve conflicts in the evidence, pass on the credibility of witnesses, or reweigh the evidence; such matters are for the finder of fact, and a conviction will be affirmed, in the absence of prejudicial error, if the evidence admitted at trial, viewed and construed most favorably to the State, is sufficient to support the conviction. *State v. Jedlicka*, 297 Neb. 276, 900 N.W.2d 454 (2017).

## ANALYSIS

*Motion to Suppress.*

Lan assigns error to the district court's factual finding that an arrest warrant had been issued at the time Wineinger arrested Lan and searched his vehicle. Based on this assignment, Lan argues that the court erred in denying his motion to suppress. We note Lan's assigned error does not directly align with his argument, but his argument makes clear that he is attacking the district court's factual finding as the basis for denying the motion to suppress. Because Lan did not renew his motion to suppress at trial, however, we need not address this alleged error.

Where there has been a pretrial ruling regarding the admissibility of evidence, a party must make a timely and specific objection to the evidence when it is offered at trial in order to preserve any error for appellate review. *State v. Oldson*, 293 Neb. 718, 884 N.W.2d 10 (2016). The failure to object to evidence at trial, even though the evidence was the subject of a previous motion to suppress, waives the objection, and a party will not be heard to complain of the alleged error on appeal. *Id.* Furthermore, an objection, based on a specific ground and properly overruled, does not preserve a question for appellate review on some other ground not specified at trial. *Id.*

Lan's pretrial motion to suppress the evidence recovered during the search of his vehicle was denied. At trial, Lan objected to the offer of the Glock handgun, box of ammunition, the Glock magazines, and the speed loader on the basis of relevance. His objection was overruled. Lan made no objection on the basis of the Fourth Amendment, nor did he renew his motion to suppress; therefore, he waived any argument regarding receipt of the items found as a result of the inventory search. See *id.*

*Limiting Instruction.*

Prior to trial, Lan sought to exclude evidence regarding an encounter he had with the Lius' daughter, Juliet, in Chicago. He argued that because the incident occurred outside of Douglas County, it "has nothing to do with this case." The court denied the motion but advised Lan that he could object to the evidence as it was offered. During a break in Sao's testimony, the court inquired of the State whether it planned to amend its allegations contained in count II of the information to include family members, consistent with the statute under which the charge was brought. The prosecutor indicated that doing so would be consistent with the statute. The trial then continued with Sao's testimony and that of Thuy and Juliet, among others.

Lan did not object during Juliet's testimony regarding his visit to her house in Chicago; rather, he objected only to receipt of emails from him to Juliet on the basis of hearsay, relevance, foundation, and authentication. After Juliet had testified, during a break in the trial, the State moved to amend the information to include, among other things, an allegation that Lan did "willfully harass Dr. Liu or family or a household member of Dr. Liu" consistent with its previous discussion with the court of its intent to do so. Lan objected on the basis of relevance because Juliet did not live in Douglas County. The State responded that the purpose of the addition was not to include the encounter with Juliet, but rather to include interactions with Thuy. The prosecutor suggested that "[w]e can craft the jury instruction to read that way so there is no confusion." The court allowed the filing of the amended information.

Prior to the close of trial, the court explained the jury instruction process to Lan and told him if he had any proposed instructions, they needed to be in writing. Lan indicated he understood. A subsequent jury instruction conference was held, and Lan had no proposed instruction regarding Juliet's testimony, nor did he object to any instruction other than the inclusion of stalking as a lesser offense of stalking while in possession of a firearm.

Lan asserts that the district court erred in failing to provide a limiting instruction regarding the proper use of Juliet's testimony regarding interactions with Lan outside of Douglas County, Nebraska. The record, however, indicates Lan did not request or propose any such instruction before, during, or after introduction of the evidence of his encounter with Juliet. In the absence of

a request for a limiting instruction, there is no reversible error in a court's failure to give a limiting instruction. *State v. Valverde*, 286 Neb. 280, 835 N.W.2d 732 (2013). We therefore reject this argument.

*Sufficiency of Evidence.*

Lan claims the evidence admitted at trial was insufficient to sustain his conviction. He argues that none of his statements in the record constitute a threat to commit violence. We disagree.

We note Lan's argument solely relates to his conviction for terroristic threats and focuses only on the first element, "making a threat to commit any crime of violence." Brief for appellant at 24. Therefore, we limit our analysis to that count and element. See *State v. Filholm*, 287 Neb. 763, 848 N.W.2d 571 (2014) (explaining that alleged error must be both specifically assigned and specifically argued in brief of party asserting error to be considered by appellate court).

A person commits terroristic threats if he or she threatens to commit any crime of violence with the intent to terrorize another or in reckless disregard of the risk of causing such terror. Neb. Rev. Stat. § 28-311.01(1)(a), (c) (Reissue 2016). A "crime of violence" is an act which injures or abuses through the use of physical force and which subjects the actor to punishment by public authority. *State v. Tucker*, 17 Neb. App. 487, 764 N.W.2d 137 (2009). Robbery, murder, sexual assault, and assault with intent to inflict great bodily injury are crimes of violence. *Id.* A defendant does not have to actually commit a crime of violence, because it is the threat of violence that is at the heart of the crime of terroristic threats. *Id.*

For purposes of the offense of terroristic threats, a threat may be written, oral, physical, or any combination thereof. *Id.* A direct expression of intention by the actor is not required because the intent with which an act is committed involves a mental process and intent may be inferred from the words and acts of the defendant and from the circumstances surrounding the incident. *Id.* Whether a defendant possesses the requisite state of mind is a question of fact and may be proven by circumstantial evidence. *Id.* Terroristic threats cases will largely be determined by the context of the interaction between the involved people. *Id.*

The emails Lan sent the Lius contain ample evidence of terroristic threats, particularly threats to commit crimes of violence. The various emails, which were spread out over the course of four months, included evidence of Lan's threats to harm the Lius. Lan's language included, "God will punish you. There is an old Chinese saying, harming others is like harming yourself, those who harm others will get harmed themselves." The first email sent on March 31, 2018, stated,

God will definitely punish fake Christians like you. The brothers and sisters in the Omaha Chinese Church will see what kind of end will come to you.

God will punish you as a wolf in sheep's clothing. God will send evil people to hell. You are vicious. Do you have some new tricks that are even more evil? This is the second warning to you. We shall see. I am waiting.

The May 16 email stated, "I will make newspaper headlines out of your household." Finally, the June 10 email said, "God will punish the LIUs and we can all witness what kind of ending they will have."

These statements may not be indications of crimes of violence on their own; however, when taken into account with Lan's actions and the circumstance surrounding the emails, they rise to the level of threats to commit violence. See *State v. Tucker, supra*. Lan was at the Lius' church on January 7, 2018. On January 8, Lan was outside Sao's office building, entered an area in the building not open to the public, and a few hours later was standing at the entrance to the Lius' neighborhood. In February, Lan purchased two Glock handguns. That same month, Lan went to the Lius' daughter's home in Chicago and was "casing" the house. In May, Lan obtained a concealed carry permit. The Lius then filed a protection order against Lan. Subsequently, Lan drove overnight from Chicago back to Omaha and stopped his vehicle at the Lius' church in a "surveillance position." At that time, Lan's vehicle contained a Glock handgun, two ammunition magazines, a box of ammunition, a speed loader, a spent shell casing, and an aerial map of the Lius' church. His digital camera contained pictures of the Lius' church and neighborhood, along with Sao's office building and personal vehicle.

These evidentiary objects and incidents, along with the emails Lan sent the Lius and circumstances of the Lius' previous interactions with Lan, indicate Lan threatened to commit a crime of violence against the Lius. Therefore, a jury could have found Lan made a threat to commit a crime of violence, particularly when viewing the circumstantial evidence surrounding the emailed threats. Therefore, viewing the evidence in the light most favorable to the State, we find that the evidence was sufficient for the jury to find Lan guilty of terroristic threats.

CONCLUSION

For the aforementioned reasons, we affirm Lan's convictions.

AFFIRMED.