IN THE NEBRASKA COURT OF APPEALS

**MEMORANDUM OPINION AND JUDGMENT ON APPEAL**
**(Memorandum Web Opinion)**

STATE V. AVITSO

NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).

STATE OF NEBRASKA, APPELLEE,

V.

KOMLANVI M. AVITSO, APPELLANT.

Filed May 10, 2022.    No. A-21-690.

Appeal from the District Court for Douglas County: TIMOTHY P. BURNS, Judge. Affirmed.

Thomas C. Riley, Douglas County Public Defender, and Lori A. Hoetger for appellant.

Douglas J. Peterson, Attorney General, and Erin E. Tangeman for appellee.

PIRTLE, Chief Judge, and BISHOP and WELCH, Judges.

WELCH, Judge.

## I. INTRODUCTION

In the early morning hours of May 19, 2019, Komlanvi M. Avitso, a Lyft driver, accepted a passenger. This trip led to events which culminated in Avitso's conviction of first degree sexual assault. On appeal, Avitso contends that the district court erred in allowing a nurse to testify regarding the victim's out-of-court statements made during a sexual assault exam, that the evidence was insufficient to support his conviction, and that the sentence imposed was excessive. For the reasons stated herein, we affirm.

## II. STATEMENT OF FACTS

On May 18, 2019, the victim spent an evening out with friends where she consumed numerous alcoholic beverages at a restaurant and, later, at a bar. By the end of the evening, because the victim had become extremely intoxicated, one of the victim's friends called a Lyft vehicle to take the victim home. The victim provided her home address which the friend entered into the Lyft

phone application. At 12:35 a.m., Brandon Kroenke, a Lyft driver, arrived to take the victim to the requested destination. A group of the victim's friends walked the victim from the bar and helped her into the backseat of the vehicle, but none accompanied the victim for her ride home.

During the trip, Kroenke noticed that the victim, who he described as being "pretty inebriated," had passed out. As he approached the destination address provided through the app, he realized that the address was incorrect because the destination address was an intersection. Despite Kroenke's attempt to wake the victim to get the correct address for the destination drop-off, the victim was unable to keep her head up, stay awake, or provide him with a correct address. At some point, the victim woke up and requested that Kroenke drop her off at the next gas station. At 1:19 a.m. on May 19, 2021, Kroenke dropped off the victim at a gas station located near 96th and Q Streets.

Shortly thereafter, the victim requested a second Lyft. Avitso responded to that second request and picked up the victim at the gas station at 1:24 a.m. The victim, who was initially unable to recall the events of the night after leaving the bar, woke up around 9 or 10 a.m. in her apartment wearing the same clothes that she put on the night before. The victim's phone contained a receipt from Lyft with a driver named "Jules," later identified as Avitso. Despite the fact that the victim resided only 5 or 10 minutes away from the gas station where Avitso had picked her up, the Lyft receipt reflected that the trip lasted from 1:24 a.m. until 2:40 a.m. and stated that the ride ended at an address that was 30 blocks from the victim's apartment.

After remembering a few details of the night, including that she had been in a Lyft vehicle for what she felt like was "an extremely long time," was in the front seat of that vehicle, saw her jeans around her ankles, felt a brief touch on her leg, and heard a male voice with an accent ask her if she was on her period to which she replied "yes," the victim became concerned that she had been sexually assaulted and contacted law enforcement. After law enforcement conducted an investigation which included a sexual assault examination conducted on the victim, Avitso was charged with first-degree sexual assault.

During the June 2021 jury trial, evidence was admitted as previously set forth. The victim also testified as to other details she remembered from the early morning hours on May 19, 2019, including that she had spoken with someone at the bar and that she believed, at one point, the Lyft vehicle was parked in a parking lot because she recalled seeing concrete.

During law enforcement's investigation of the victim's report, officers collected records from Lyft, determined that the vehicle used during the second Lyft trip was registered to Avitso, collected surveillance video from the gas station, and obtained data from the victim's cell phone including information regarding the victim's location during the course of the evening. Based on the investigation, officers determined that Avitso picked up the victim at about 1:24 a.m., originally set the destination for one address, and then changed the destination to another address one minute later. The victim was not familiar with either of the addresses. Data from the victim's cell phone showed that the victim's phone was moving at 1:26 a.m., was stationary from 1:32 a.m. until 1:52 a.m. near 108th and Harrison where a gas station is located, and that the phone was stationary from 2:05 a.m. to 2:52 a.m. at the drop-off address listed on the Lyft receipt near 119th and P Street which officers identified as a parking lot of a commercial building. Officers determined that the victim was not dropped off at the 119th and P Street location because video

surveillance showed Avitso's vehicle pulling into a hotel parking lot at 3:23 a.m. The hotel clerk indicated that Avitso asked for a motel room, but upon being advised of the cost, Avitso left stating he was looking for a room for $45. While Avitso was speaking with the clerk, a witness at the hotel observed a motionless woman reclined in the front passenger seat of Avitso's vehicle. Surveillance video showed Avitso's vehicle backing out of the hotel parking lot at 3:33 a.m. The hotel was located one mile from the victim's home address. At 3:44 a.m., the victim's cellular data indicated that her phone was again stationary and at an address which corresponded with her apartment complex. At 3:30 a.m. and 3:41 a.m., the victim received telephone calls from an unrecognized number; investigators later determined that the number belonged to Avitso.

Following the interview with law enforcement, the victim was taken to the hospital where she consented to a sexual assault (SANE) examination conducted by nurse practitioner Jami Dowell. Dowell testified that she explained the SANE procedure to the victim and told the victim that it was important to tell her what she could remember about the assault. Dowell stated that her job was to complete a head-to-toe examination, look for anything that was hurting or bothering the victim, and to collect forensic evidence. Dowell testified that she needed to know the victim's account of the events to know why the victim was seeking medical care and to help guide the treatment and diagnosis of the victim. In addition to the facts as stated above, the victim told Dowell that she had not had consensual sex with anyone for five days prior to the SANE examination.

Dowell did not observe any injuries during her external pelvic exam of the victim; however, during the internal examination, Dowell observed swelling and redness. Although Dowell testified that those types of injuries could have been caused by irritation from physical touch or from an infection, she ruled out an infection because the victim was not exhibiting symptoms which typically accompany an infection. Dowell further ruled out menstruation as the cause of the irritation. She testified that the irritation to the labia was significant and was deep enough that it went in between the labial fold which indicated to Dowell that the irritation was not caused by something momentary. Dowell stated that this area is not easy to get to on the genitalia and in order for her to see it during the exam, she had to use both hands and spread the area completely open.

During her examination of the victim, Dowell collected swabs of areas including the victim's labia, mons pubis, and vagina. DNA testing on these swabs generated a DNA profile consistent with a mixture from 2 individuals. The swab from the victim's mons pubis contained a DNA mixture profile indicating the mixture was 60 percent contributed by the victim and 40 percent contributed by Avitso. The swab from the victim's labia contained a DNA mixture profile indicating the mixture was 40 percent contributed by the victim and 60 percent contributed by Avitso. The DNA profile from the mons pubis was 3.52 octillion times more likely to have originated from the victim and Avitso than from the victim and another random individual and the DNA profile from the labia swab was 3.54 octillion times more likely to have originated from the victim and Avitso than from the victim and another random individual. The vaginal swab generated a single DNA profile from the victim which was common due to the abundance of female cells in the vagina which can mask a potential DNA mixture and, further, because the victim was

menstruating, the likelihood of generating a single DNA profile was increased since blood also contains an abundance of female cells.

Avitso, who testified in his own defense, provided his account of the night in question and denied assaulting the victim. According to Avitso, the victim instructed him to deviate from the GPS instructions. He stated that the victim later requested that Avitso take her to a gas station. Avitso agreed and when they arrived, he helped her out of the car and into the bathroom at the gas station. At some point, he informed the cashier that the victim had been in the bathroom and was not responding. The cashier unlocked the bathroom door, and the victim was sitting inside on the toilet with her head down and her pants to her knees. Avitso testified that he asked the victim if she still needed a ride to which she replied that she was coming. After some time, Avitso returned to ask the victim if she was still coming and provided her with her purse, her phone, and toilet paper. Several minutes later, the victim emerged from the bathroom and reentered Avitso's vehicle and sat in the front seat. Avitso testified that the victim again provided different directions and, at one point, the victim requested that he stop in the middle of the road. Avitso pulled into a parking lot and attempted to determine the victim's home address, but the victim was not able to provide Avitso with a consistent answer. Avitso testified that he obtained the victim's driver's license from inside her purse which listed a Lincoln address. He asked the victim if she resided in Lincoln, and she told him she did. Avitso informed the victim that he could not transport her to Lincoln and the victim requested that Avitso take her back to the gas station. Avitso testified that he returned to the gas station, but the victim refused to exit his vehicle. Because he was unable to determine her address, Avitso stated that he went to two different hotels but that the victim did not have the money to afford the hotels. When he returned to the car, Avitso stated the victim told him that she did not want to have sex with him because she did not have sex with black men and was on her period. Avitso testified that he told the victim to exit his vehicle, but she again refused to do so. He further recounted that the victim was unable to provide him with her correct home address, but he obtained her correct home address from the victim's cell phone. Avitso stated that after dropping off the victim at her apartment complex, he called the victim twice to make sure she made it to her apartment, but the victim did not answer.

Avitso also called several witnesses to speak to his reputation for honesty in the community including his wife, his father-in-law, a co-worker, an acquaintance, a friend, his brother, a law firm investigator, and his pastor. The State recalled Detective David Pecha as a rebuttal witness to testify regarding the results of a search he conducted on Avitso's cell phone following the incident, which search demonstrated visits to a website associated with escort services, searches for interior car washes, and searches for flights to Canada.

The jury convicted Avitso of the charged offense and a presentence investigation report was ordered. At the sentencing hearing, Avitso presented evidence of his accomplishments since immigrating to the United States which included obtaining higher education degrees, being a "family man" with a wife and two young children, having a minimal criminal history with no crimes of violence, and being assessed as medium/moderate to low risk to reoffend. The district court acknowledged Avitso's circumstances including that Avitso was a productive member of society, but ultimately determined that it could not overlook the serious nature of the offense. The court sentenced Avitso to 10 to 12 years' imprisonment with credit of 765 days for time served.

Avitso has timely appealed to this court and is represented by different counsel than represented him at trial and sentencing.

## III. ASSIGNMENTS OF ERROR

Avitso assigns as error that the district court (1) abused its discretion in allowing Jami Dowell, the SANE nurse, to testify to the out of court statements made during the sexual assault examination; (2) erred in finding as a matter of law that the evidence was sufficient to support his conviction; and (3) abused its discretion in imposing an excessive sentence.

## IV. STANDARD OF REVIEW

In proceedings where the Nebraska evidence rules apply, the admissibility of evidence is controlled by the Nebraska evidence rules; judicial discretion is involved only when the rules make such discretion a factor in determining admissibility. *State v. Vigil*, 283 Neb. 129, 810 N.W.2d 687 (2012). Where the Nebraska evidence rules commit the evidentiary question at issue to the discretion of the trial court, the admissibility of evidence is reviewed for an abuse of discretion. *Id.*

Apart from rulings under the residual hearsay exception, an appellate court will review for clear error the factual findings underpinning a trial court's hearsay ruling and review de novo the court's ultimate determination whether the court admitted evidence over a hearsay objection or excluded evidence on hearsay grounds. *State v. Cheloha*, 25 Neb. App. 403, 907 N.W.2d 317 (2018). Whether a statement was both taken and given in contemplation of medical diagnosis or treatment is a factual finding made by the trial court in determining the admissibility of evidence. *Id.*; *State v. Jedlicka,* 297 Neb. 276, 900 N.W.2d 454 (2017).

Regardless of whether the evidence is direct, circumstantial, or a combination thereof, and regardless of whether the issue is labeled as a failure to direct a verdict, insufficiency of the evidence, or failure to prove a prima facie case, the standard is the same: In reviewing a criminal conviction, an appellate court does not resolve conflicts in the evidence, pass on the credibility of witnesses, or reweigh the evidence; such matters are for the finder of fact, and a conviction will be affirmed, in the absence of prejudicial error, if the evidence admitted at trial, viewed and construed most favorably to the State, is sufficient to support the conviction. *State v. Hassan*, 309 Neb. 644, 962 N.W.2d 210 (2021). Only where evidence lacks sufficient probative force as a matter of law may an appellate court set aside a guilty verdict as unsupported by evidence beyond a reasonable doubt. *State v. Dixon*, 282 Neb. 274, 802 N.W.2d 866 (2011).

A sentence imposed within the statutory limits will not be disturbed on appeal in the absence of an abuse of discretion by the trial court. *State v. Morton*, 310 Neb. 355, 966 N.W.2d 57 (2021).

## V. ANALYSIS

### 1. HEARSAY

Avitso first argues that the district court erred in admitting into evidence statements made by the victim to Dowell during the victim's medical examination. Specifically, Avitso argues the victim's statements to Dowell relating to the length of time she was in the Lyft, the victim's

statements to the perpetrator that she wanted to go home, and the perpetrator's question to her as to whether she was on her period, were all inadmissible hearsay and the court erred in overruling defense counsel's hearsay objection to the proffered statements.

Hearsay is a statement, other than one made by the declarant while testifying at the trial or hearing, offered to prove the truth of the matter asserted. Neb. Rev. Stat. § 27-801(3) (Cum. Supp. 2020). A declarant's out-of-court statement offered for the truth of the matter asserted is inadmissible unless it falls within a definitional exclusion or statutory exception. Neb. Rev. Stat. § 27-802 (Reissue 2016). *State v. Jedlicka, supra.*

One such exception to the hearsay rule is Neb. Rev. Stat. § 27-803(3) (Reissue 2016) which provides:

> Subject to the provisions of section 27-403, the following are not excluded by the hearsay rule, even though the declarant is available as a witness:
>
> . . . .
>
> (3) Statements made for purposes of medical diagnosis or treatment and describing medical history, or past or present symptoms, pain, or sensations, or the inception or general character of the cause or external source thereof insofar as reasonably pertinent to diagnosis or treatment.

(We note that, as of August 28, 2021, the language previously contained in § 27-803(3) is now located at Neb. Rev. Stat. § 27-803(4) (Cum. Supp. 2020).)

> Rule 803(3) is based on the notion that a person seeking medical attention will give a truthful account of the history and current status of his or her condition in order to ensure proper treatment. In order for statements to be admissible under rule 803(3), the party seeking to introduce the evidence must demonstrate (1) that the circumstances under which the statements were made were such that the declarant's purpose in making the statements was to assist in the provision of medical diagnosis or treatment and (2) that the statements were of a nature reasonably pertinent to medical diagnosis or treatment by a medical professional.

*State v. Jedlicka*, 297 Neb. 276, 286, 900 N.W.2d 454, 464 (2017).

A statement is generally considered admissible under the medical purpose hearsay exception, Neb. R. Evid. 803(3), § 27-803(3), if gathered for dual medical and investigatory purposes. *State v. Vigil*, 283 Neb. 129, 810 N.W.2d 687 (2012).

> Under rule 803(3), the fundamental inquiry when considering a declarant's intent "is whether the statement, despite its dual purpose, was made in legitimate and reasonable contemplation of medical diagnosis or treatment." Under rule 803(3), there need not be direct evidence of the declarant's state of mind; instead, the appropriate state of mind of the declarant may be reasonably inferred from the circumstances. Determining if the circumstances warrant inferring the appropriate state of mind is necessarily a fact-specific determination.

*State v. Jedlicka*, 297 Neb. at 290-91, 900 N.W.2d at 466.

While recognizing that "statements are 'generally considered admissible under the medical purpose hearsay exception if gathered for dual medical and investigatory purposes,' as long as the statements 'were made in legitimate and reasonable contemplation of medical diagnosis or treatment,'" Avitso argues:

> An important limitation on this exception is that statements relating to fault are generally not admissible. [*State v. Vigil*, 283 Neb. 129,] 141[, 810 N.W.2d 687 (2012)]. Courts do allow statements related to fault, however, when the alleged victim is a child, especially when the child has a familial relationship with the abuser. *Id*. This is because the child cannot be treated effectively if sent "back into the abuser's clutches." *Id*.
>
> Though Dowell testified that she relies on a patient's description of what led to the events in her treatment, the statements here were not for the purpose of medical diagnosis or treatment. [The victim's] statements as to the length of the car ride, that [the victim] kept asking to go home, and that Avitso asked her if she was on her period, are not relevant to the issue of treatment. Dowell did not elaborate on how these statements were pertinent to her treatment of [the victim]. Additionally, [the victim] had reported to the hospital for a SANE exam at the directions of officers, so it is likely that at least a major purpose of [the victim's] statements were to aid the investigation.

Brief for appellant at 16. We disagree.

The question here is whether the victim's statements to Dowell, which included information such as the length of the car ride, the victim's requests to go home, and the questions to the victim about whether she was on her period, were made in legitimate and reasonable contemplation of medical diagnosis or treatment. We hold that they were.

In this case, the victim could not specifically remember what happened to her while she was under the influence of intoxicating liquor. For that reason, in order to determine what, if any, medical event happened to her, Dowell sought to elicit what the victim could remember from the series of events which took place the previous night. Through the victim's recounting of these events, Dowell was able to determine that the victim may have been sexually assaulted, which then led her to perform a physical examination which included, but was not limited to, DNA sampling. Under these circumstances, we do not find the challenged statements the victim made to Dowell as statements of fault as Avitso suggests. Instead, although made for dual medical and investigatory purposes, we find the victim's statements to Dowell were made in legitimate and reasonable contemplation of medical diagnosis or treatment. Stated differently, Dowell's questions and the victim's challenged responses were narrowly tailored to determine what happened to the victim the prior evening in order to determine whether the victim required medical treatment. Accordingly, the district court did not err in admitting the victim's statements to Dowell over defense counsel's objections. This assigned error fails.

### 2. INSUFFICIENCY OF EVIDENCE TO SUPPORT CONVICTION

Avitso next argues that the evidence was insufficient to support his conviction for first degree sexual assault.

When reviewing a criminal conviction for sufficiency of the evidence to sustain the conviction, the relevant question for an appellate court is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *State v. Grant*, 310 Neb. 700, 968 N.W.2d 837 (2022).

As charged, in order to establish Avitso's guilt of the offense of first degree sexual assault, the State was required to prove, beyond a reasonable doubt, that Avitso subjected the victim to sexual penetration "without the consent of the victim" or that he "knew or should have known that the victim was mentally or physically incapable of resisting or appraising the nature of his . . . conduct." Neb. Rev. Stat. § 28-319(1)(a) and (b) (Reissue 2016).

> The statutory definition of "sexual penetration" in effect at the time of the offense was
>
> sexual intercourse in its ordinary meaning, cunnilingus, fellatio, anal intercourse, or any intrusion, however slight, of any part of the actor's or victim's body or any object manipulated by the actor into the genital or anal openings of the victim's body which can be reasonably construed as being for nonmedical or nonhealth purposes. Sexual penetration shall not require emission of semen.

Neb. Rev. Stat. § 28-318(6) (Reissue 2016). Although not applicable to the instant case, we note that, effective September 1, 2019, the statutory definition of sexual penetration has since been amended as follows:

> sexual intercourse in its ordinary meaning, cunnilingus, fellatio, anal intercourse, or any intrusion, however slight, of any part of the actor's or victim's body or any object manipulated by the actor into the genital or anal openings of the victim's body which can be reasonably construed as being for nonmedical, *nonhealth, or nonlaw enforcement* purposes. Sexual penetration shall not require emission of semen.

Neb. Rev. Stat. § 28-318(6) (Supp. 2019) and (Cum. Supp. 2020) (emphasis supplied). The 2020 amendment to § 28-316, effective November 14, 2020, did not change the statutory definition of sexual penetration.

Penetration is "the slightest intrusion into the genital opening" and the State can prove penetration by either direct or circumstantial evidence." *State v. Hibler*, 302 Neb. 325, 347-48, 923 N.W.2d 398, 417 (2019); *State v. Smith*, 302 Neb. 154, 922 N.W.2d 444 (2019). It is not necessary that the vagina be entered for sexual penetration or that the hymen be ruptured. *State v. Hibler, supra.* Testimony that the perpetrator touched the victim's skin folds known as the labia and between the lips of the victim's vagina is sufficient to prove entry of the vulva or labia and is sufficient to support a finding of sexual penetration. *State v. Hibler, supra*; *State v. Smith, supra.*

Avitso argues that there was insufficient evidence in the record to establish that he subjected the victim to sexual penetration. We disagree. Here, although the victim was unable to remember all of the details surrounding the evening of the incident, evidence of penetration was located during the victim's SANE exam. During the victim's internal pelvic exam, Dowell observed swelling and redness. Dowell ruled out menstruation and an infection as the causes and testified that the irritation to the labia was significant and was deep enough that it went in between

the labial fold which indicated to Dowell that the irritation was not caused by something momentary. Additionally, Avitso's DNA evidence was located on swabs of the victim's labia and mons pubis. The swab from the victim's mons pubis contained a DNA mixture profile containing 60 percent contributed by the victim and 40 percent contributed by Avitso. The swab from the victim's labia contained a DNA mixture profile containing 40 percent contributed by the victim and 60 percent contributed by Avitso. The DNA profile from the victim's mons pubis was 3.52 octillion times more likely to have originated from the victim and Avitso than from the victim and another random individual and the DNA profile from the labia swab was 3.54 octillion times more likely to have originated from the victim and Avitso than from the victim and another random individual. When considered with the evidence of events reconstructed from the examination of cellular phones, the Lyft receipts, and the victim's memory of events, this evidence was sufficient to establish penetration. An appellate court does not resolve conflicts in the evidence, pass on the credibility of witnesses, evaluate explanations, or reweigh the evidence presented, which are within a fact finder's province for disposition. *State v. John*, 310 Neb. 958, 969 N.W.2d 894 (2022). This assignment of error fails.

### 3. EXCESSIVE SENTENCE

Avitso's final assignment of error is that sentence imposed was excessive. Here, Avitso was convicted of first degree sexual assault, which is a Class II felony. See § 28-319(2). Class II felonies are punishable by 1 to 50 years' imprisonment. See Rev. Stat. § 28-105 (Reissue 2016). Avitso's sentence of 10 to 12 years' imprisonment is within the statutory limits.

When sentences imposed within statutory limits are alleged on appeal to be excessive, the appellate court must determine whether the sentencing court abused its discretion in considering well-established factors and any applicable legal principles. *State v. Morton*, 310 Neb. 355, 966 N.W.2d 57 (2021). The relevant factors for a sentencing judge to consider when imposing a sentence are the defendant's (1) age, (2) mentality, (3) education and experience, (4) social and cultural background, (5) past criminal record or record of law-abiding conduct, and (6) motivation for the offense, as well as (7) the nature of the offense and (8) the amount of violence involved in the commission of the crime. *Id*. The sentencing court is not limited to any mathematically applied set of factors, but the appropriateness of the sentence is necessarily a subjective judgment that includes the sentencing judge's observations of the defendant's demeanor and attitude and all the facts and circumstances surrounding the defendant's life. *Id*. We further note that § 28-319(2) provides, in part, that "[t]he sentencing judge shall consider whether the actor caused serious personal injury to the victim in reaching a decision on the sentence."

At the time of preparation of the presentence investigation report (PSR), Avitso was 41 years old and married with two children. Avitso, who was born in Lomo Togo, Africa, moved to the United States in 2004, and obtained U.S. residency. Avitso has a bachelor's degree and two master's degrees, was employed full-time at Bellevue University, and worked part-time for Lyft. Avitso's criminal history is minimal, consisting of convictions for no city vehicle registration, failure to wear seatbelts, no vehicle liability insurance, and no financial responsibility. Both the level of service/case management inventory and the Vermont Assessment of Sex Offender Risk II (VASOR II) assessed Avitso as a medium/moderate to low risk to reoffend. The PSR indicated

that Avitso did not accept responsibility for committing the crime, that customs enforcement had placed a hold on Avitso, and that Avitso would not be eligible to return to his job at Bellevue University. The PSR recommended a sentence of imprisonment because Avitso was not an appropriate candidate for community-based supervision.

The PSR also included the victim's impact statement in which the victim set forth that

[in] the following days, weeks, and months [after the sexual assault,] I became a shell version of myself. I couldn't sleep unless it was during the day. [I] couldn't eat, [I] couldn't work. I would have panic attacks that would have me hyperventilating in the middle of my office on the days I did make it into work. I didn't feel safe in my own apartment . . .

The victim stated that she is in therapy and has suffered from stress and anxiety. She also stated that "'safe' rides such as Lyft and Uber . . . would never really feel safe to [her] again."

The record reflects that the district court considered the appropriate sentencing factors after reviewing the PSR, the facts of the case, and the arguments made by the parties. Although the district court acknowledged that Avitso was a "good family man" and "a productive member of the community," the court placed particular weight on the seriousness of the crime charged and noted that, despite overwhelming DNA evidence, Avitso failed to take responsibility or admit his guilt.

There is nothing in this record which indicates that the court did not properly consider the relevant factors. Further, based upon the factors including that the sentence imposed was within the statutory sentencing range, the nature of the offense, and Avitso's failure to accept responsibility for the offense, the sentence imposed was not an abuse of discretion. This assignment of error fails.

## VI. CONCLUSION

For the reasons stated above, we affirm Avitso's conviction and sentence.

AFFIRMED.