IN THE NEBRASKA COURT OF APPEALS

## MEMORANDUM OPINION AND JUDGMENT ON APPEAL
(Memorandum Web Opinion)

STATE V. SAUCEDA

NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).

STATE OF NEBRASKA, APPELLEE,

V.

LUCIO SAUCEDA, APPELLANT.

Filed May 27, 2025.    No. A-24-518.

Appeal from the District Court for Douglas County: KIMBERLY MILLER PANKONIN, Judge. Affirmed.

Jason E. Troia, of Dornan, Troia, Howard, Breitkreutz, Dahlquist & Klein, P.C., L.L.O., for appellant.

Michael T. Hilgers, Attorney General, and Nathan A. Liss for appellee.

PIRTLE, BISHOP, and WELCH, Judges.

WELCH, Judge.

## I. INTRODUCTION

Lucio Sauceda appeals from his jury convictions in the Douglas County District Court for two counts of first degree sexual assault of a child, and one count each of incest, third degree sexual assault of a child, and failure to appear, and the sentences imposed thereon. Sauceda argues that the district court imposed excessive sentences and that his trial counsel was ineffective. For the reasons stated herein, we affirm.

## II. STATEMENT OF FACTS

In June 2021, Investigator Mick Seymour, with the child victim sexual assault unit, began investigating a Child Protective Services (CPS) intake report involving allegations of sexual abuse of A.G. and L.S. by Sauceda. The CPS intake was received after L.S. disclosed sexual abuse to

- 1 -

her therapist. During forensic interviews, A.G. and L.S. both disclosed sexual abuse by Sauceda. Thereafter, Investigator Seymour interviewed Sauceda. Although Sauceda did not make any direct admissions during the interview, Investigator Seymour observed multiple inconsistencies in Sauceda's statements, as well as quasi-denials and qualifying statements about Sauceda not being able to remember events, blacking out, acknowledging being in the victims' room, and believing that one of the victims was his wife. At the conclusion of the interview, Sauceda was arrested.

The State charged Sauceda with two counts of first degree sexual assault of a child involving A.G., both Class IB felonies; incest of a victim under 18 years old, a Class IIA felony; and third degree sexual assault of a child involving L.S., a Class IIIA felony. After Sauceda posted bond and was released from jail pending trial, he failed to appear for a pretrial hearing, after which the State added a charge for failure to appear, a Class IV felony.

The trial was held over 4 days in February 2024. Testimony was adduced from Investigator Seymour; victims L.S. and A.G.; L.S.' therapist; Casandra Salado, a family friend; the nurse practitioner who completed A.G.'s medical examination; Colleen Brazil, a forensic interviewer; and Sarah Spizzirri, a Douglas County Attorney's Office investigator. Sauceda testified in his own behalf.

### 1. INVESTIGATOR SEYMOUR'S TESTIMONY

Investigator Seymour testified that in June 2021, he was assigned as the primary investigator after a CPS intake was received following L.S.' therapist's report that L.S. had disclosed that she was sexually abused by Sauceda. After reviewing the information, Investigator Seymour scheduled forensic interviews of both L.S. and A.G. Investigator Seymour testified that during A.G.'s interview, she disclosed that she had been subjected to various forms of sexual contact and sexual penetration by Sauceda beginning in South Dakota when she was 6 or 7 years old, and that the abuse continued after the family moved to Nebraska. A.G. reported that the abuse occurred multiple times per week during the period of time when she was 8 to 15 years old. Investigator Seymour testified that L.S. disclosed sexual contact by Sauceda, but no penetration. Investigator Seymour testified that, during his interview of Sauceda, Sauceda did not make any direct admissions, but that he gave "quasi-denials" such as "I don't remember if I did, so I must not have," or made qualified statements that Investigator Seymour described as "it's not a denial or a strong denial. It's an acknowledgement that it's a possibility." Investigator Seymour testified that Sauceda made qualified statements about blacking out, acknowledging being in the girls' room but saying things like, "maybe, I don't recall," or acknowledging that Sauceda would apologize if he heard the accusations straight from the girls.

### 2. L.S.' TESTIMONY

L.S. testified that Sauceda was her biological father, and she described their relationship as "overall, pretty good" but "we fought a lot." L.S. testified that Sauceda was strict and that he controlled the type of clothes, makeup, or hairstyles she wore and the music she listened to. L.S. also testified that she felt that Sauceda "picked on her a lot" and that he treated her differently than A.G. who she described as Sauceda's "favorite."

According to L.S., the first incident of sexual contact by Sauceda occurred when she was 5 years old when they lived in a house near Deer Park in Omaha, Nebraska. L.S. testified that

Sauceda "told me to step in front of him on the floor and get on my hands and my knees and turn around. And he then got behind me, and he started doing things." She testified that Sauceda got behind her and that "his lower genital region" was touching her "rear end." L.S. testified that she knew his penis was erect because she "felt something stiff" and that Sauceda rubbed his penis against her "backside." Thereafter, she testified that Sauceda gave her a "fun-sized Snicker bar" and told her not to say anything. L.S. testified that at least once per week, Sauceda would come into her and A.G.'s room, and would come lay between them in the bed, and that Sauceda would do "things" to A.G. She testified that she knew Sauceda was assaulting A.G. because after he left the room, "[A.G.'s] pants would be to her ankles."

L.S. testified that another incident occurred after they had moved to another house in Omaha located on Evans Street. L.S. testified that she had "woken up, and I had seen [Sauceda's] head between her legs" and that she felt "prickles from a beard" on her vagina. L.S. testified that Sauceda was the only man living in the house at that time.

### 3. A.G.'s Testimony

A.G. testified that Sauceda was her stepfather who she met when she was 2 years old. She testified that Sauceda was the only father she had ever known and that her mother married Sauceda when she was approximately 12 years old. A.G. acknowledged that Sauceda treated her differently than her two siblings in that Sauceda was "kinder" and "I wouldn't really get in trouble as much as my siblings, and I would usually get something when I asked for it." A.G. testified that the first time she remembered Sauceda touching her in a way that made her uncomfortable was when she was 5 or 6 years old, but that the first time she remembered something occurring in Omaha was when they lived in the Deer Park house when she was 8 or 9 years old. She testified that she remembered the first incident occurred when she and her sister

> shared a room. We had the silver bunk beds at the time, so we were sleeping in the same bed. I remember hearing the door open and the light from the hallway coming in, and [Sauceda] climbed up onto the bed with us, and he was laying in between me and my sister. And [Sauceda] had pulled down my pants, and he was touching me. And then it ended when my mom had come into the room and asked what he was doing up there. And [Sauceda] just said he was laying down with us, and then he left.

A.G. testified that after Sauceda pulled down her pants, he began touching her chest and her "private area" or her "vagina" with his hands. She testified that these incidents took place two or three times per week.

A.G. testified that on another occasion in the Deer Park house, Sauceda "had pulled me down to the edge of the bed, like the bottom, and he had undressed me from the bottom half, and he would just start touching skin to skin." She testified that he would usually be "rubbing [her] 'clitoris' in circles with his hand."

A.G. testified that around the time she was in middle school, and they lived in a blue duplex apartment, Sauceda

> started touching [me] with his hands, and he pulled my shirt up, and he was touching my chest. And then he had pulled his penis out and rubbed it against my vagina, and he had me wrap my hand around his penis as well, and he was rubbing his penis against my

mouth." She said the incident stopped after her mom walked in and saw that Sauceda "had his pants down and so did I, and she had caught him rubbing himself on me. She kind of pulled him out of the room. She pulled my pants back up for me.

About a year later, A.G. testified that her mother and Sauceda got married, but that Sauceda continued to touch her in a way that made her uncomfortable. She stated that the last time she remembered was when she was 15 years old when they lived at a house on Evans Street. She testified on this occasion:

[Sauceda] had come into my room, and he had pulled me down to the edge of the bed. I was pretending to be asleep, but I tried to keep him off. I had my legs closed together, trying to keep him away. He had tried to give me money so that I would cooperate, and I took it because I didn't understand, but once he had started saying, come on, just let me, just a little bit, I -- I gave it back to him. I told him no, and I tried to go back to sleep, and he got a little angry, and he just left.

A.G. testified that after he left, she started crying and explained what happened to L.S. After this, she and L.S. told their mother when she came home. A.G. testified that this was the second time she had told her mother about Sauceda touching her in a way that made her uncomfortable as she had told her at one point when they were still living in the Deer Park house. Despite her mother walking in on one incident and informing her mother on two other occasions, A.G. testified that her mother did not believe her and was "trying to deny it, I guess."

A.G. testified that between the time she was about 8 and 15 years old, Sauceda touched her vagina with his hands, rubbed his penis against her vagina, touched her breasts with his hands and his mouth, and used his mouth to touch her vagina. A.G. testified that Sauceda touched her vagina with his mouth on more than one occasion. She testified that on one specific occasion when she was 13 years old, Sauceda came into her room, pulled her to the edge of the bed by her legs, pulled her clothes off, and "used his tongue, [and] moved it back and forth" on her vagina. She testified that a similar incident occurred when they lived at the house on Evans Street. A.G. testified that she did not remember Sauceda saying anything but that "sometimes he would hum to . . . make a vibration" when he was using his mouth to touch her vagina.

A.G. testified that she told Salado, who was her best friend's mother, about the sexual abuse either "right before [L.S.] had told her therapist or right after."

### 4. SALADO'S TESTIMONY

Salado testified that she was friends with the victims' mother; that their daughters had been best friends since second grade; and that, by 2020, the families had gotten "really close." Sometime in 2020, due to the COVID-19 pandemic, the children began attending school remotely. Salado testified that both victims, their younger brother, and her children all had remote learning at her house because she had a better internet connection.

Salado testified that in August 2020, when the new school year started, she saw the children every day from 7 a.m. to 7 p.m. at her house due to their schooling and the victims' mother's work schedule. Salado testified that she met Sauceda about 10 times and that the only thing she really knew about Sauceda's work was that "he worked out of town a lot" and that she was aware of the

varying timeframes that Sauceda was out of town for work because the children, or the victims' mother, would tell her during conversations.

Salado testified that between August to October 2020, she started noticing changes in A.G.'s demeanor. She eventually had a conversation with A.G. and L.S. during which they disclosed sexual abuse by Sauceda. Salado testified that she did not report the disclosure to law enforcement, but did speak with the victims' mother about a month after the victims' disclosure. Salado testified that the victims asked her not to tell anyone because "they were scared . . . [Sauceda] would go to jail and [the victims' mother] would just break down and go into a dark place." Salado testified that she observed changes in the victims' demeanor during times when Sauceda was out of town for work, as compared to when he was home. Salado testified that when Sauceda was home, "you could just tell by their actions there was a lot of tension in the house. They were . . . down. . . . [T]hey were sad. They wouldn't want to go home."

### 5. L.S.' THERAPIST'S TESTIMONY

L.S.'s therapist testified that she treated L.S. between April 2021 and January 2022 and that during that time, L.S. disclosed inappropriate touching and sexual assault by Sauceda. The therapist testified that she reported the disclosure to the child abuse hotline.

### 6. TESTIMONY REGARDING FORENSIC INTERVIEWS AND A.G.'S MEDICAL EXAMINATION

Brazil testified that she completed both victims' forensic interviews. Both interviews were offered and received into evidence during the trial. Brazil testified as to both victims' disclosures, which were consistent with their testimony provided at trial. Brazil testified that she did not have any concerns about the possibility of one of the siblings influencing the other to disclose despite their close emotional relationship because "I think I would have more concern about that if the siblings were younger, but at 18 and 15, they both were able to give a history and didn't appear within what they were talking about that there was influence."

The nurse practitioner who completed A.G.'s medical examination testified that during the examination, A.G. disclosed sexual abuse by Sauceda consistent with her forensic interview and trial testimony and that A.G. declined to participate in a genital examination, but that even if A.G. had participated in the genital examination, "95 percent of genital exams are normal."

### 7. JAIL CALLS

Spizzirri testified that she was employed as an investigator for the Douglas County Attorney's Office and that the State requested that she listen to jail calls between Sauceda and the victim's mother. She testified that she also contacted a court-certified Spanish interpreter to help her translate and transcribe portions of the calls that were in Spanish. The jail calls and their respective transcriptions were offered and received into evidence during the trial.

According to Spizzirri, while in jail, Sauceda made 546 calls to the victims' mother; Sauceda made comments about if the victims could not be found, or they did not show up to testify, that the case against him would be dismissed; and Sauceda would be getting $9,000 from the return of his $10,000 bond.

## 8. Sauceda's Testimony

Sauceda testified in his own behalf. Sauceda testified that he had been with the victims' mother since 2005 and that he had a very strict parenting style. Sauceda denied having sexual contact with, or sexually abusing, either of the victims.

Sauceda acknowledged that he was an alcoholic and had abused cocaine during the period of time that the sexual abuse was alleged to have occurred. Sauceda testified that his alcoholism and blackouts began occurring whenever he met his brother-in-law, Roy Garcia, and that he would not remember going to sleep every night. Although Sauceda denied the allegations, he testified that on one occasion, when A.G. was 15 years old, he had returned from a night of drinking and, after not finding his wife in their bed, went into A.G.'s room and that

> I walked in the room, which I thought it was my wife, you know. And I did go in there, and I started touching her and stuff, and all of a sudden my daughter woke up. And when she woke up, . . . her face was partially covered, and I thought it was my wife, and I was pretty intoxicated. You know, I had been drinking for two, three days, since Friday.

Sauceda clarified that there was no sexual touching on that occasion because A.G. woke up when he was trying to take her shorts off, and he noticed it was not his wife. He testified that he dragged A.G. down by her feet the way he would normally play with his wife. Sauceda testified that he attempted to console A.G. but that he did not know how, so he tried to give her some money. He testified that his wife had contacted him after he left for work about the incident and told him that they needed to talk when he got home from work.

Sauceda testified that during the time that the allegations were alleged to have occurred, Garcia had also been living in the house with the family. Sauceda testified that Garcia is similarly bearded although "he has a little bit less of a beard" than Sauceda. Sauceda testified that he was often out of town for work during the timeframe and that 3 months was the longest period he was gone at a time.

Sauceda denied that his jail calls to the victims' mother involved an attempt to get L.S. and A.G. to refuse to testify against him or that the discussion about $10,000 was an attempt at bribery. Sauceda testified that A.G. apologized to him and had put money on his books in jail. Sauceda further admitted that he failed to appear for his pretrial conference.

## 9. Jury Verdict and Motion for New Trial

Following the trial, the jury convicted Sauceda of all the charged offenses: two counts of first degree sexual assault of a child, and one count each of incest, third degree sexual assault, and failure to appear.

Sauceda timely filed a motion for a new trial, alleging that the verdict was contrary to law, that the verdict was not sustained by sufficient evidence, and that there was newly discovered evidence which could not with reasonable diligence have been discovered and produced at trial. Following the hearing thereon, the district court denied the motion for a new trial.

## 10. Sentencing

During the sentencing hearing, the district court stated:

In order to determine an appropriate sentence, I've taken into consideration all the information and argument here today, the information and observations that I was privy to by presiding over the jury trial, including the testimony of witnesses in this case, including [A.G. and L.S.] The Court has reviewed the PSI in detail and all the information in the PSI, including your age, mentality, education, your background, your past criminal -- or lack of criminal record, nature of the offense, and motivation for the offenses.

The district court imposed the following sentences: 60 to 70 years' imprisonment for each of the first degree sexual assault of a child convictions, 10 to 20 years' imprisonment for the incest conviction, 2 to 3 years' imprisonment for the third degree sexual assault of a child conviction, and 1 to 2 years' imprisonment for the failure to appear conviction. The first degree sexual assault of a child convictions and the incest conviction were ordered to be served concurrently to each other. The third degree sexual assault of a child conviction and the failure to appear conviction were ordered to be served consecutively to each other and consecutively to the sentences imposed for the two first degree sexual assault of a child convictions and the incest conviction. The district court further noted that Sauceda's first degree sexual assault of a child convictions carried a 15-year mandatory minimum. The court also credited Sauceda 267 days for time served.

Sauceda has timely appealed from his convictions and sentences and is represented by new counsel on appeal.

## III. ASSIGNMENTS OF ERROR

Sauceda assigns that (1) the district court imposed excessive sentences, and (2) his trial counsel was ineffective in failing to (a) review evidence with him to adequately prepare a defense, (b) file a motion in limine and object "to prevent the jury from reading defense counsel's statement as to his intent on appearing for court," (c) object to Salado's statements concerning her silence, and (d) pose a foundational objection to Salado's testimony about when Sauceda was out of town.

## IV. STANDARD OF REVIEW

An appellate court will not disturb a sentence imposed within the statutory limits absent an abuse of discretion by the trial court. *State v. Rivera-Meister*, 318 Neb. 164, 14 N.W.3d 1 (2024). An abuse of discretion occurs when a trial court's decision is based upon reasons that are untenable or unreasonable or if its action is clearly against justice or conscience, reason, and evidence. *Id*.

Whether a claim of ineffective assistance of trial counsel may be determined on direct appeal is a question of law. *State v. Rezac*, 318 Neb. 352, 15 N.W.3d 705 (2025). In reviewing claims of ineffective assistance of counsel on direct appeal, an appellate court decides only whether the undisputed facts contained within the record are sufficient to conclusively determine whether counsel did or did not provide effective assistance and whether the defendant was or was not prejudiced by counsel's alleged deficient performance. *Id*.

## V. ANALYSIS

### 1. EXCESSIVE SENTENCES

Sauceda first assigns that the district court abused its discretion in imposing excessive sentences. Specifically, Sauceda contends that the district court failed to properly consider the

sentencing factors when imposing the sentence and that a review of the sentencing factors "dictated a less severe punishment." Brief for appellant at 17. Sauceda argues that at the time of sentencing, he was 37 years old, had a minimal criminal history, had a consistent and stable work history, had significant childhood trauma, and had been abusing alcohol to the point of blackouts and memory loss. He contends that his sentence was near the top range available and that the sentencing factors warranted a lesser sentence.

Sauceda was convicted of two counts of first degree sexual assault of a child, both Class IB felonies; one count of incest, a Class IIA felony; one count of third degree sexual assault of a child, a Class IIIA felony; and one count of failure to appear, a Class IV felony. See, Neb. Rev. Stat. § 28-319.01 (Reissue 2016) (first degree sexual assault of child); Neb. Rev. Stat. § 28-703 (Reissue 2016) (incest); Neb. Rev. Stat. § 28-320.01 (Reissue 2016) (third degree sexual assault of child); Neb. Rev. Stat. § 29-908 (Reissue 2016) (failure to appear).

Regarding Sauceda's sentences for first degree sexual assault of a child, he was sentenced to 60 to 70 years' imprisonment for each of the first degree sexual assault of a child convictions. These sentences are within the statutory range for Class IB felonies, which are punishable by a minimum of 20 years' imprisonment and a maximum of life imprisonment. See Neb. Rev. Stat. § 28-105 (Cum. Supp. 2024). Additionally, the sentence complies with the dictates of § 28-319.01(2), which requires that a conviction of first degree sexual assault of a child carry a mandatory minimum sentence of 15 years' imprisonment for the first offense.

Regarding Sauceda's sentence for incest, he was sentenced to 10 to 20 years' imprisonment, which is within the statutory sentencing range for Class IIA felonies which are punishable by no minimum and a maximum of 20 years' imprisonment. See § 28-105.

Regarding Sauceda's sentence for third degree sexual assault of a child, he was sentenced to 2 to 3 years' imprisonment, which is within the statutory sentencing range for Class IIIA felonies which are punishable by no minimum and a maximum of 3 years' imprisonment followed by 9 to 18 months of post-release supervision, and/or a $10,000 fine. See § 28-105.

Regarding Sauceda's sentence for failure to appear, he was sentenced to 1 to 2 years' imprisonment, which is within the statutory sentencing range for Class IV felonies which are punishable by no minimum and a maximum of 2 years' imprisonment followed by 0 to 12 months of post-release supervision, and/or a $10,000 fine. See, § 28-105; Neb. Rev. Stat. § 29-2204.02(2)(a) (Reissue 2016) (if criminal offense is Class IV felony, court shall impose sentence of probation unless defendant is concurrently or consecutively sentenced to imprisonment for any felony other than another Class IV felony).

Where a sentence imposed within the statutory limits is alleged on appeal to be excessive, as is the case here, the appellate court must determine whether a sentencing court abused its discretion in considering and applying the relevant factors, as well as any applicable legal principles, in determining the sentence to be imposed. *State v. Rivera-Meister, supra*. In determining a sentence to be imposed, relevant factors customarily considered and applied are the defendant's (1) age, (2) mentality, (3) education and experience, (4) social and cultural background, (5) past criminal record or record of law-abiding conduct, and (6) motivation for the offense, as well as (7) the nature of the offense and (8) the amount of violence involved in the commission of the crime. *Id.*

We note that although Sauceda contends that the district court failed to properly consider sentencing factors in determining his sentences, the district court stated that it reviewed the presentence investigation report, which included information concerning all of the factors to be considered by a sentencing court. See *State v. Greer*, 309 Neb. 667, 962 N.W.2d 217 (2021).

At the time of the presentence investigation report, Sauceda was 37 years old, married, and had two dependents. Sauceda's highest level of education was seventh grade, and prior to his arrest, he was employed full time. His criminal history included eight convictions for driving during suspension; four convictions for failure to appear; two convictions for no operator's license violation; and one conviction each for leaving the scene of a property damage accident and driving under the influence, as well as traffic offenses. The level of service/case management inventory assessed Sauceda as a very high risk to reoffend. On the New Vermont Assessment for Sex Offender Risk and the Sex Offender Treatment and Intervention and Progress Scale assessments, Sauceda was assessed as a moderate-high risk to reoffend. The PSR noted that Sauceda had a history of alcohol and drug abuse.

Based on factors including that the sentences imposed were within the applicable statutory sentencing ranges, Sauceda's criminal history, his high risk to reoffend, and the seriousness and nature of the charges, we cannot say that the sentences imposed were excessive.

2. INEFFECTIVE ASSISTANCE OF COUNSEL

Sauceda next assigns that his trial counsel was ineffective in failing to (a) review evidence with him to adequately prepare a defense, (b) file a motion in limine and object "to prevent the jury from reading defense counsel's statement as to his intent on appearing for court," (c) object to Salado's statements concerning her silence, and (d) pose a foundational objection to Salado's testimony concerning when Sauceda was out of town. Sauceda is represented by new counsel in this direct appeal.

Recently, in *State v. Swartz*, 318 Neb. 553, 566-67, 17 N.W.3d 174, 184-85 (2025), the Nebraska Supreme Court reiterated the propositions of law relative to a defendant's claims of ineffective assistance of counsel made in a direct appeal:

> When a defendant's trial counsel is different from his or her counsel on direct appeal, the defendant must raise on direct appeal any issue of trial counsel's ineffective performance which is known to the defendant or is apparent from the record; otherwise, the issue will be procedurally barred in a subsequent postconviction proceeding. *State v. Rezac*[, 318 Neb.] 352, 15 N.W.3d 705 (2025).
>
> Generally, to prevail on a claim of ineffective assistance of counsel under *Strickland v. Washington*[, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984)], the defendant must show that his or her counsel's performance was deficient and that this deficient performance actually prejudiced the defendant's defense. *State v. Dat*[, 318 Neb.] 311, 15 N.W.3d 410 (2025). To show that counsel's performance was deficient, a defendant must show that counsel's performance did not equal that of a lawyer with ordinary training and skill in criminal law. *Id.* To show prejudice in a claim of ineffective assistance of counsel, the defendant must demonstrate a reasonable probability that but for counsel's deficient performance, the result of the proceeding would have been different. *Id.*

An ineffective assistance of counsel claim is raised on direct appeal when the claim alleges deficient performance with enough particularity for (1) an appellate court to make a determination of whether the claim can be decided upon the trial record and (2) a district court later reviewing a petition for postconviction relief to recognize whether the claim was brought before the appellate court. *Id.*

Once raised, an appellate court will determine whether the record on appeal is sufficient to review the merits of the ineffective performance claims. *Id.* The record is sufficient if it establishes either that trial counsel's performance was not deficient, that the appellant will not be able to establish prejudice as a matter of law, or that trial counsel's actions could not be justified as a part of any plausible trial strategy. *Id.*

(a) Counsel's Failure to Review Evidence
and Prepare Defense

Sauceda first assigns that his counsel was ineffective in "fail[ing] to review the evidence with him to adequately prepare a defense." Specifically, he argues that had he been properly consulted, he could have contributed to the theory that L.S. was simply retaliating against him for his strict parenting by providing details such as her loss of phone privileges for sending naked pictures of herself to boys and older men, discussing sex acts with boys, and receiving naked pictures of boys. He also argues that he could have provided counsel with information that three other men lived with the parties during their time in Nebraska as it related to L.S.' claim that it was Sauceda that was between her legs and not someone else. We find the record is sufficient to reject Sauceda's claim.

As it relates to Sauceda's claim that he was unable to communicate specific details to his counsel to support his claim that L.S. was fabricating her testimony in retaliation for his strict parenting, we find that the record is sufficient to reject this claim for lack of prejudice. The specific issue was raised by Investigator Seymour in his interview with Sauceda wherein Sauceda alleged that L.S.' allegations were fabricated in retaliation for his strict parenting. When asked why A.G. was making similar allegations, Sauceda explained that the girls must have come up with the story together because they wanted him out of the house. Again, at trial, Sauceda testified and told the jury the same thing. Although provided with the opportunity at trial, Sauceda never mentioned the more specific examples of denying phone privileges. As such, Sauceda cannot now assert that he was denied the opportunity to raise this issue, as he did raise the issue himself during his testimony and he had the opportunity to elaborate and cannot contend there is a reasonable probability that the result of the trial would have been different if he had first been allowed to provide this information to his trial counsel.

As to his claim about other males living in the house who could have possibly committed the offense against L.S., this was also addressed at trial. In relation to the incident where L.S. woke up to the feeling of a man's beard between her legs, Sauceda was asked about the incident and alleged his brother-in-law, Garcia, lived with them for a while and perhaps it was a case of mistaken identity. And during closing arguments, Sauceda's counsel referenced that testimony stating "[t]here was testimony from [Sauceda] that there were different males in and out of the home during long periods of time when he was working . . . ." Having raised the issue himself at trial, again, Sauceda cannot claim that he was denied the opportunity to do so and cannot contend

there was a reasonable possibility the result of the trial would have been different if he had been allowed the opportunity to present this information to his trial counsel. This claim fails, and it is not preserved for postconviction review.

### (b) Failure to Object to Pretrial Hearing Transcript

Sauceda next assigns that his counsel was ineffective for failing to file a motion in limine or object to the pretrial hearing transcript which included trial counsel's statements about Sauceda's intent not to appear for the pretrial. He argues that the transcript was not relevant and was highly prejudicial, that the jury should not have heard or read defense counsel's statements from the pretrial hearing, and that he was prejudiced by counsel's failure to object because the transcript suggested that "Sauceda had something to hide in not wanting to face the charges." Brief for appellant at 23.

During the trial, a transcript of the August 10, 2012, pretrial hearing was received into evidence without objection. The exhibit reflected that during a discussion regarding the issuance of a warrant for Sauceda's failure to appear, the rescheduling of the trial until Sauceda could be located, and the court requesting defense counsel to inform the court if counsel reached Sauceda in the next few days, defense counsel stated, "Judge, we've heard multiple times that he did not intend to appear anyway" and that "I haven't heard from him since late June."

Sauceda was charged with, among other offenses, failure to appear. Section 29-908 provides, in pertinent part:

Whoever is charged with a felony and is released from custody under bail, recognizance, or a conditioned release and willfully fails to appear before the court granting such release when legally required or to surrender himself within three days thereafter, shall be guilty of a Class IV felony, in addition to any other penalties or forfeitures provided by law.

The evidence contained within the pretrial transcript was relevant to the issue of whether Sauceda willfully failed to appear for the hearing. Although Sauceda argues that the evidence was not relevant to his trial and was prejudicial, we note that most, if not all, evidence is intended to be prejudicial; it is only that evidence which is unduly prejudicial that is inadmissible. *State v. Esch*, 315 Neb. 482, 997 N.W.2d 569 (2023). There is nothing in the record that suggests the evidence was unduly prejudicial. Because the issue of whether Sauceda willfully failed to appear for the pretrial hearing was central to the issue of his guilt or innocence of that offense, any objection to the transcript of that hearing would have been meritless. Defense counsel is not ineffective for failing to raise a meritless argument. See *State v. Mabior*, 314 Neb. 932, 994 N.W.2d 65 (2023). Accordingly, this assignment of error fails.

### (c) Failure to Object to Salado's Statements
### Concerning Her Silence

Sauceda next assigns and argues that his trial counsel was ineffective for failing to object to Salado's testimony regarding why she waited before reporting A.G.'s disclosure of sexual abuse. Sauceda argues that counsel should have objected because the testimony was not relevant, was hearsay, and was unfairly prejudicial.

Hearsay is a statement, other than one made by the declarant while testifying at the trial or hearing, offered to prove the truth of the matter asserted. *State v. Jedlicka*, 297 Neb. 276, 900 N.W.2d 454 (2017). A declarant's out-of-court statement offered for the truth of the matter asserted is inadmissible unless it falls within a definitional exclusion or statutory exception. *Id*. The law generally provides that statements are not hearsay if they are offered to show the effect on the listener. *State v. Lee*, 304 Neb. 252, 934 N.W.2d 145 (2019).

During the trial, Salado testified that after hearing the disclosure she did not do anything with the information or report it because "[t]he kids had asked me not to because they were scared [Sauceda] would go to jail and [their mother] would just break down and go into a dark place." Counsel did not object to Salado's testimony. Although Salado testified to what the victims told her, the statement that they were scared that Sauceda would go to jail and their mother would go to a "dark place" went directly to the effects on the listener. That is, the statement by the children was not offered for its truth, but for the effect on Salado as to why she did not immediately report the disclosure. Therefore, the statement is not hearsay. The testimony was relevant as it related to why Salado delayed before reporting the incident, and there is nothing in the record or any assignment made as to how the evidence was unfairly prejudicial to Salado. Accordingly, any objection to this testimony would have been overruled. As we noted earlier, defense counsel is not ineffective for failing to raise a meritless argument. See *State v. Mabior, supra*. This assignment of error fails.

### (d) Failure To Object on Foundation to Salado's Testimony About When Sauceda Was Out of Town

Sauceda's final claim is that his trial counsel was ineffective for failing to object on foundation to Salado's testimony regarding her knowledge of when Sauceda would be out of town for work.

Salado testified during trial that she was friends with the victim's mother and that their daughters had been best friends since they were in second grade. By 2020, Salado testified that the families had become very close due to the COVID-19 pandemic, and the children began remote schooling at her house. Salado testified that both victims and their younger brother were remote learning at her house with her children because she had better internet service. Salado testified that in August 2020 when the new school year started, she cared for the children every day from 7 a.m. to 7 p.m. while they attended online school and until their mother got off work.

Salado testified that the only thing she really knew about Sauceda's work was that "he worked out of town a lot." She stated that she knew when Sauceda was out of town for work because the children, or the victims' mother would tell her during conversations. Further, Salado testified that between August to October 2020, she started noticing changes in A.G.'s demeanor and eventually sat down with both A.G. and L.S. wherein they disclosed the sexual abuse. In reference to her opinion as to whether Salado noticed a change in the victims' demeanor during times when Sauceda was out of town, the following colloquy took place:

> Q. During this entire time -- so we've talked about how . . . Sauceda . . .
> . . . .
> Q. -- okay, worked and would sometimes be in town and sometimes be out of town.
> A. Yes.

- 12 -

Q. And you had an opportunity to view the demeanor of the daughters during this time, both [L.S. and A.G.]

A. Yes.

Q. Okay. Did you notice any differences in their demeanor between when . . . Sauceda . . . was in town versus when he was out of town for work?

A. Yes.

Q. Okay. And tell us about that.

[Defense counsel:] Judge, I would object on foundation. We need to know more about how she would have that information.

THE COURT: Would you lay a little more foundation, please.

[Prosecutor]: Okay.

THE COURT: Sustained.

The State then laid additional foundation by adducing testimony of consistent conversations with the children and their mother about when Sauceda was out of town for work. Salado thereafter testified without objection that when Sauceda was home, "you could just tell by their actions there was a lot of tension in the house. They were, again, down. . . . [T]hey were sad. They wouldn't want to go home."

Based on our review of the record, although Sauceda argues that counsel did not object on foundation to Salado's testimony regarding her knowledge of when Sauceda was out of town, his argument is refuted by the record. Trial counsel specifically objected based on foundation, which objection was sustained by the court. Sauceda does not specifically allege or argue that the State failed to lay additional foundation or that the additional foundation laid was inadequate following his counsel's objection. Because we find that Sauceda's allegation is refuted by the record, this assignment of error fails.

## VI. CONCLUSION

For the reasons stated above, we affirm Sauceda's convictions and sentences.

AFFIRMED.